1  PETER H. MASON (BAR NO. 71839)
   JOSHUA D. LICHTMAN (BAR NO. 176143)
2  REBECCA J. WINTHROP (BAR NO. 116386)
   **NORTON ROSE FULBRIGHT US LLP**
3  555 South Flower Street
   Forty-First Floor
4  Los Angeles, California  90071
   Telephone:    (213) 892-9200
5  Facsimile:    (213) 892-9494
   peter.mason@nortonrosefulbright.com
6  joshua.lichtman@nortonrosefulbright.com
   rebecca.winthrop@nortonrosefulbright.com
7
   Attorneys for Creditor
8  FARMERS INSURANCE EXCHANGE

9          **UNITED STATES BANKRUPTCY COURT**
10   **CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION**

11  In re:                              Case No.  6:16-bk-16877-WJ

12          RUSSEL DENNIS HILES, III,    Chapter 11

13                                       **CREDITOR FARMERS INSURANCE
        Debtor and Debtor-in-Possession    EXCHANGE'S OBJECTION TO NOTICE OF
14                                       SALE OF ESTATE PROPERTY [DKT. #34] AND
                                         OPPOSITION TO DEBTOR'S MOTION [DKT.
15                                       #32] FOR AUTHORITY TO:**

16                                       (1) **EMPLOY CONCIERGE AUCTIONS, LLC TO
                                             AUCTION DEBTOR'S PROPERTY (66876
17                                           Gist Rd., Bend, OR 97703) AND PAYMENT OF
                                             MARKETING FEES AND AUCTIONEER
18                                           FEES (BUYERS PREMIUM);**
                                         (2) **EMPLOY CASCADE SOTHEBY'S
19                                           INTERNATIONAL REALTY AS REAL
                                             ESTATE BROKER;**
20                                       (3) **SELL THE PROPERTY AT AUCTION
                                             SUBJECT TO COURT APPROVAL AND
21                                           ALLOWING ACCEPTANCE OF BACK-UP
                                             BIDDERS;**
22                                       (4) **ESTABLISH BIDDING PROCEDURES;**
                                         (5) **SCHEDULE HEARING DATE FOR
23                                           APPROVAL OF AUCTION;**
                                         (6) **PAY SECURED CREDITOR, PROPERTY
24                                           TAXES, AND CLOSING COSTS; AND**
                                         (7) **APPROVE OF SALE FREE AND CLEAR OF
25                                           LIENS PURSUANT TO 11 U.S.C. SECTION
                                             363(f) [DKT. #32]**
26
                                         Date:   September 13, 2016
27                                       Time:   1:00 p.m.
                                         Ctrm:  304
28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND .............................................................................. 2

ARGUMENT ...................................................................................................... 4

A.   Mr. Hiles Has Not Shown Sufficient Cause For a Rushed Auction Of The Property. ........... 4

    1.   The *Lionel* factors do not weigh in favor of the motion ................................... 6

    2.   The *General Motors* factors do not weigh in favor of the motion ................. 7

    3.   Mr. Hiles has not satisfied Local Rule 6004-1(c)(2)(A) ................................. 7

    4.   The authorities on which Mr. Hiles relies are inapposite ................................. 8

    5.   Courts that approved 363(b) motions did so under conditions not (yet) satisfied by Mr. Hiles and denied such motions based on evidentiary showings similar to Mr. Hiles' ....... 9

B.   Mr. Hiles Should Be Required To Obtain Either An Appraisal Or A Stalking Horse Bid And Any Auction Should Have A Reserve Price Reasonably Related Thereto ........... 11

C.   The Proposed Auction Agreement Does Not Provide For Sufficient Marketing ................. 12

D.   The Motion Fails To Justify Paying Full Commissions To Both The Auctioneer And A Broker ........................................................................................................ 13

E.   If A 363 Sale Is Permitted, The Net Proceeds After Payment Of Sales Costs, Property Taxes And The Secured Creditor Should Be Escrowed Pending Plan Confirmation ........................................................................................... 13

CONCLUSION ................................................................................................. 16

Document Prepared
on Recycled Paper

1

2

# TABLE OF AUTHORITIES

3

Page(s)

4

## Cases

5

*In re Air Beds, Inc.*,
  92 B.R. 419 (9th Cir. B.A.P. 1988)..................................................................14

6

*In re Alpha Industries, Inc.*,
  84 B.R. 703 (Bankr. D. Mont. 1988) ................................................................8

7

8

*In re Ashley River Consulting, LLC*,
  2015 Bankr. LEXIS 2268 (Bankr. S.D.N.Y. 2015) .........................................11, 15

9

*In re Boston Generating, LLC*,
  440 B.R. 302 (Bankr. S.D.N.Y. 2010) .........................................5, 6, 10, 11, 12, 14

10

11

*In re Chateaugay Corp.*,
  973 F.2d 141 (2d Cir. 1992)............................................................................14

12

*In re Conroe Forge & Manufacturing Corp.*,
  82 B.R. 781 (Bankr. W.D. Pa. 1988) ..............................................................14

13

14

*In re Continental Air Lines, Inc.*,
  780 F.2d 1223 (5th Cir. 1986) .........................................................................15

15

16

*In re Crutcher Resources Corp.*,
  72 B.R. 628 (Bankr. N.D. Tex. 1987) ...............................................................9

17

*In re Defender Drug Stores, Inc.*,
  145 B.R. 312 (9th Cir. BAP 1992)....................................................................15

18

19

*Ford Motor Credit Co. v. Weaver*,
  680 F.2d 451 (6th Cir. 1982)..............................................................................5

20

*In re General Motors Corp.*,
  407 B.R. 463 (Bankr. S.D.N.Y. 2009) ..........................................................5, 6, 7

21

22

*In re Gucci*,
  126 F.3d 380 (2d Cir. 1997)...............................................................................8

23

24

*In re Integrated Res., Inc.*,
  147 B.R. 650 (S.D.N.Y. 1992) .........................................................................11

25

*In re Intermagnetics Am., Inc.*,
  926 F.2d 912 (9th Cir. 1991)..............................................................................4

26

27

*In re LDG South, LLC*,
  2010 Bankr. LEXIS 5291 (Bankr. M.D. Fla. 2010)..........................................11

28

*In re Lionel Corp.*,
    722 F.2d 1063 (2d Cir. 1983) .................................................................5, 6, 7, 9

*In re Onouli-Kona Land Co.*,
    846 F.2d 1170 (9th Cir. 1988) ..............................................................................8

*In re: Plaza Family Partnership*,
    95 B.R. 166 (E.D. Cal. 1989) ...............................................................................4

*In re Station Casinos, Inc.*,
    2010 Bankr. LEXIS 5672 (Bankr. D. Nev. 2010) ...........................................11, 13

*In re Tex. Rangers Baseball Ptnrs*,
    431 B.R. 707 (Bankr. N.D. Tex. 2010) ...............................................................11

*In re W. Biomass Energy LLC*,
    2013 Bankr. LEXIS 3166 (Bankr. D. Wyo. 2013) ...............................................9

*In re Walter*,
    83 B.R. 14 (9th Cir. BAP 1988) ....................................................................5, 14

### Rules and Statutes

11 U.S.C. § 363(1) ....................................................................................................1

11 U.S.C. § 363 ..................................................................................4, 10, 11, 14, 15

11 U.S.C. § 363(b) ......................................................................5, 7, 8, 9, 10, 11, 12, 14

11 U.S.C. § 363(m) ...................................................................................................8

11 U.S.C. § 1123(a)(5) ............................................................................................14

11 U.S.C. § 1125 .....................................................................................................15

11 U.S.C. § 1126 .....................................................................................................15

11 U.S.C. § 1129(a)(7) ...........................................................................................15

11 U.S.C. § 1129(b)(2) ...........................................................................................15

Local Rule 6004-1(c)(2)(A) ...............................................................................5, 7

Local Rule 6004-1(h) .............................................................................................14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOCUMENT PREPARED
ON RECYCLED PAPER

# **INTRODUCTION**

Creditor Farmers Insurance Exchange ("FIE") hereby opposes, in part, the motion of Debtor and Debtor-in-Possession Russel Dennis Hiles III ("Mr. Hiles") "for authority to: (1) employ Concierge Auctions. LLC ("Concierge") to auction Debtor's property located at 66876 Gist Rd., Bend, OR 97703 ("Property") and authorize payment of marketing fees and auctioneer fees (buyer's premium) pursuant to that certain Auction Marketing Agreement dated as of August 16. 2016; (2) employ Cascade Sotheby's International Realty ("Sotheby's") as real estate broker; (3) sell the Property at auction subject to Court approval and allowing acceptance of back-up bidders; (4) establish bidding procedures: (5) schedule hearing date for approval of auction results; (6) pay secured creditor, property taxes, and closing costs; and (7) approve of sale free and clear of liens pursuant to 11 U.S.C. Section 363(1)." [Dkt. #32 at 2.]

As detailed below, FIE opposes the requested relief because:

(i)    Mr. Hiles has not satisfied Section 363's requirement to demonstrate sufficient business justification or cause to proceed with a rushed auction sale of the Property (referred to herein as the "Bend Property") that, by Debtor's account [Dkt. #22 at 4, 6], comprises over 75% of the value of the estate's assets.

(ii)    Mr. Hiles has not satisfied the requirement under LBR 6004-1(c)(2)(A) to support his motion with a declaration "establishing the value of the property and that the terms and conditions of the proposed sale are in the best interest of the estate."

(iii)    Mr. Hiles' proposed auction process and bidding procedures do not satisfy his fiduciary duty to act in the best interest of the bankruptcy estate, including unsecured creditors such as FIE, in that: (1) there would be no "reserve" or minimum floor price for the proposed auction and (2) the proposed Auction Marketing Agreement with Concierge is silent as to what marketing, advertising and publicity obligations Concierge will be obligated to undertake, other than a vague promise that they will be "commercially reasonable." [Dkt. #32 at 8, ¶ 26; 15, ¶ 21; 28 and 29, ¶2.]

(iv)    Mr. Hiles' proposal to pay both a 5% brokerage commission to Sotheby's and a 10% commission (albeit styled as a "buyer's premium," but which amount necessarily reduces

1    the amount an economically rational buyer would otherwise be willing to pay directly to Debtor

2    in a bilateral transaction) plus an "Engagement Fee" to Concierge [Dkt. #32 at 13-14, ¶¶ 13-14]

3    does not satisfy Mr. Hiles' fiduciary duty to act in the best interest of the bankruptcy estate,

4    including unsecured creditors; in particular, Mr. Hiles has failed to establish a business

5    justification for employing a broker (and, in particular, the broker whom he says has been

6    marketing the Property unsuccessfully for months already) if the Property is to be sold at auction.

7        (v)    Mr. Hiles' motion is silent as to the intended disposition of the net proceeds of the

8    proposed sale of the Property, after payment of sale expenses, property taxes and the secured

9    creditor, Bank of America. Consistent with LBR 6004-1(h), and given the factual background

10    detailed below, any order permitting the pre-confirmation sale of the primary asset of the

11    bankruptcy estate should be expressly conditioned upon those net proceeds being escrowed (and,

12    specifically, not disbursed to Mr. Hiles or for use in paying his personal expenses) pending plan

13    confirmation.[1]

14                    **FACTUAL BACKGROUND**

15        As indicated in Mr. Hiles' schedules, FIE is the largest unsecured creditor of Mr. Hiles'

16    bankruptcy estate, with a claim for approximately $5.5 million flowing from an arbitration award

17    in favor of FIE and against Mr. Hiles issues in the AAA arbitration proceeding, *Farmers*

18    *Insurance Exchange v. Russel D. Hiles, et. al.* [Dkt. #22 at 28; Declaration of Peter H. Mason

19    ("Mason Decl."), filed herewith, ¶¶ 2-6.]

20        Mr. Hiles is an attorney residing in Palm Desert, California, who previously managed a

21    portion of FIE's litigation caseload pursuant to a Litigation Management Agreement (the "LMA")

22    entered into between Mr. Hiles and his law firm, Hiles & Associates, LLP, which previously did

23    business under the name Hiles Borgeson (referred to collectively with Mr. Hiles as "Hiles").

24

25    [1] In addition, to the extent that Mr. Hiles may have also intended to seek to proceed to sell the
      Property pursuant to LBR 6004-1(d), having served a purported Notice of Intent to Sell, Use or
26    Lease Estate Property, under that rule on August 19, 2016 [Dkt. #34], FIE objects on the ground
      that a sale of the Property would represent a sale of "all or substantially all of the debtor's assets,"
27    as Debtor's schedules assert that the Property contains over 75% of the value of all of Debtor's
      assets [Dkt. #22 at 4 and 6] and, therefore, such sale may only occur pursuant to motion and
28    Court approval. LBR 6004-1(d)(1)(A).

1 | [Mason Decl., ¶ 3.]

2 |     In the fall of 2014, a dispute arose between Hiles and FIE related to the LMA, part of

3 | which concerned a dispute as to the ownership of approximately $5.2 million that Hiles was

4 | required to keep in an FIE client trust account pursuant to the LMA, and Hiles' rejection of FIE's

5 | request for an accounting as to the disposition of those funds. [*Id.*, ¶ 4 and Ex. 1 at 22-25.] In

6 | accordance with the dispute resolution terms of the LMA, FIE initiated the above-referenced

7 | arbitration proceeding (the "Arbitration") on December 29, 2014, alleging claims for, *inter alia*,

8 | breach of fiduciary duty and misappropriation of client trust funds. [*Id.*]

9 |     On May 27, 2016, the arbitrator issued a "Partial Final Award" in favor of FIE and against

10 | Hiles, and on July 19, 2016, issued a Final Award in favor of FIE and against Hiles on the issue

11 | of attorneys' fees. [*Id.*, ¶ 5 and Exs. 1 and 2.] Collectively, those Final Award(s) resolved all

12 | claims and counterclaims in the Arbitration and directed Hiles to pay to FIE the total amount

13 | $5,540,747.70 (inclusive of pre-judgment interest calculated through May 27, 2016). [*Id.*, ¶ 5,

14 | Ex. 1 at 35 and Ex. 2 at 39.] Among the grounds for the Award(s), were the arbitrator's

15 | determination that, on November 17, 2014, Mr. Hiles "wrongfully took from the Trust Account"

16 | the sum of $2,533,291 that belonged to FIE, and did so without notice to or permission of his

17 | client FIE. [*Id.*, ¶ 6 and Ex. 1 at 29 and 35.] The arbitrator also concluded that Mr. Hiles

18 | breached his fiduciary duty to FIE by intentionally diverting to himself at least $980,1892.70

19 | from the Trust Account that he was, under the LMA, required to use to pay outside counsel fees

20 | incurred on behalf of FIE (and that FIE subsequently was required to pay to those outside counsel

21 | because Mr. Hiles had failed to do so). [*Id.*, at Ex. 1 at 32-33 and 35.] Further, the Arbitrator

22 | determined that Mr. Hiles had breached his fiduciary duty to his client FIE by intentional refusing

23 | to provide FIE with an accounting of the LMA and Trust Account records and funds upon request

24 | in September 2014, forcing FIE to incur the attorneys' fees necessary to pursue the Arbitration.

25 | [*Id.*]

26 |     During and after the Arbitration proceedings, however, FIE learned of further facts

27 | suggesting that Mr. Hiles had taken steps to dissipate assets and that raised concern he was

28 | attempting to place assets out of reach of FIE and other creditors. [Mason Decl., ¶ 7.] For

DOCUMENT PREPARED
ON RECYCLED PAPER

42357999.7

1    example, FIE learned that, on or about May 5, 2015, Mr. Hiles had executed a Grant Deed

2    purporting to transfer all right, title, and interest in real property located at 155 Metate Place,

3    Palm Desert, California 92260 (the "Palm Springs Property") – which he owned as an individual

4    – to his wife for no consideration. [*Id.*, ¶ 7 and Ex. 3.]  As reflected in those records, however,

5    Mr. Hiles, did not record the Grant Deed effecting the no-consideration transfer until May 18,

6    2016—a week after entry of the interim Arbitration award against him.[2]  [*Id.*]  In addition, Mr.

7    Hiles  testified in the Arbitration that he planned to transfer the Bend Property to his wife in the

8    near future [Mason Decl., ¶ 8 and Ex 4, at 919:22-920:8)], although the filing of this proceeding

9    may have dissuaded him from acting on that stated intention.

10       These prior unauthorized transfers of funds and the prior actual or planned transfer(s) of

11    title to the primary real estate assets owned by Mr. Hiles raise substantial concern as to the

12    propriety of the proposed Section 363 sale of the Bend Property and, specifically, as to the

13    request in Mr. Hiles' motion that the net proceeds of the proposed sale be delivered to him (as

14    Debtor-in-Possession) without any express order of the Court that those proceeds be protected for

15    the benefit of creditors and not disbursed to or used by Mr. Hiles.  Accordingly, under these

16    circumstances, if the Court is otherwise inclined to permit a Section 363 sale of the Bend

17    Property, the net proceeds should not be placed in Mr. Hiles' possession simply because that

18    would be the ordinary course for a Debtor-in-Possession.  Such proceeds should be ordered

19    escrowed pending plan confirmation or, at a minimum, ordered held in Debtor's counsel's client

20    trust account pending a further order of the Court permitting distribution thereof.

21                                    **ARGUMENT**

22    **A.    Mr. Hiles Has Not Shown Sufficient Cause For a Rushed Auction Of The Property.**

23       Mr. Hiles, as a Debtor-in-Possession, has a fiduciary duty to "protect and conserve [the

24    Bend Property] for the benefit of creditors," including FIE. *In re: Plaza Family Partnership*, 95

25    B.R. 166, 172-173 (E.D. Cal. 1989); *In re Intermagnetics Am., Inc.*, 926 F.2d 912, 917 (9th Cir.

26

27    [2]  Given that such transfer would clearly have been subject to clawback, it appears that at some
point between May 18 and August 15, 2016, when Mr. Hiles filed his schedules listing himself as

28    the sole owner of the Palm Desert Property, Mr. Hiles' wife re-transferred that property back to
him.  [*See* Dkt. #22 at 7 and 50.]

DOCUMENT PREPARED
ON RECYCLED PAPER

1   1991) (chapter 11 debtors occupy fiduciary role with respect to the contents of the estate); *Ford*

2   *Motor Credit Co. v. Weaver*, 680 F.2d 451, 462 and n. 8 (6th Cir. 1982) ("a debtor in possession

3   has the duty to protect and conserve the property in his possession for the benefit of creditors...")

4   Accordingly, Local Rule 6004-1(c)(2)(A) requires that a motion for an order authorizing the sale

5   of estate property be supported by a declaration "establishing the value of the property and that

6   the terms and conditions of the proposed sale, including the price and all contingencies, are in the

7   best interest of the estate."

8         Further, in determining whether to grant authority to sell estate assets pursuant to 11

9   U.S.C. § 363(b), the Court assesses whether the Debtor has demonstrated a "'good business

10  reason' for proceeding with the sale without awaiting the final confirmation of a plan," that is

11  consistent with the Debtor's fiduciary duty to the estate and creditors.  *E.g.*, *In re Boston*

12  *Generating, LLC*, 440 B.R. 302, 322 (Bankr. S.D.N.Y. 2010); *see In re Walter*, 83 B.R. 14, 19-20

13  (9th Cir. BAP 1988); *see In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  A mere desire

14  to "expedite bankruptcy reorganization proceedings" does not suffice as a "good business reason"

15  to permit a 363 sale or to "abandon[] proper standards" for such sale.  *In re Lionel Corp.*, 722

16  F.2d at 1070-71.  Rather, factors for the Court to consider in making that determination include:

17        •   "the proportionate value of the asset to the estate as a whole";

18        •   "the amount of elapsed time since the filing";

19        •   "the likelihood that a plan of reorganization will be proposed and confirmed in the

20        near future";

21        •   "the effect of the proposed disposition on future plans of reorganization";

22        •   "the proceeds to be obtained from the disposition vis-a-vis any appraisals of the

23        property"; and

24        •   "most importantly perhaps, whether the asset is increasing or decreasing in value."

25  *In re Walter*, 83 B.R. at 19-20; *In re Lionel Corp., 722 F.2d at 1071.*

26        Further, authorities subsequent to *Lionel* have identified as additional factors for the Court

27  to consider in determining whether to permit a 363 sale (the so-called *General Motors* factors):

28        "•   Does the estate have the liquidity to survive until confirmation of a plan?

1      • Will the sale opportunity still exist as of the time of plan confirmation?

2      • If not, how likely is it that there will be a satisfactory alternative sale opportunity,

3      or a stand-alone plan alternative that is equally desirable (or better) for creditors?

4      • Is there a material risk that by deferring the sale, the patient will die on the

5      operating table?"

6   *E.g.*, *In re Boston Generating, LLC*, 440 B.R. at 321-322; *In re General Motors Corp.*, 407 B.R.

7   463, 490 (Bankr. S.D.N.Y. 2009).

8      Here, Mr. Hiles' motion fails to establish a number of these factors in support of the

9   proposal to sell the Bend Property at auction now (and to do so with no "reserve" or floor price).

10                     **1.     The *Lionel* factors do not weigh in favor of the motion**

11      As to the first *Lionel* factor ("the proportionate value of the asset to the estate as a

12   whole"), the Bend Property was scheduled by Mr. Hiles with a value of $12 million, which is

13   over 75% of the $15.84 million claimed value of the entirety of the estate's assets.  [Dkt. 22 at 4

14   and 6.]  Thus, this first factor weighs in favor of caution in disposing of the estate's primary asset

15   in any manner that might jeopardize realizing the highest value possible.

16      As to the second *Lionel* factor ("the amount of elapsed time since the filing"), less than

17   one month has elapsed since Mr. Hiles filed on August 1, 2016.  This further supports the Court's

18   being cautious in determining whether to allow a rushed auction of the Bend Property.

19      The third and fourth *Lionel* factors ("the likelihood that a plan of reorganization will be

20   proposed and confirmed in the near future" and "the effect of the proposed disposition on future

21   plans of reorganization") do not weigh heavily in favor of the requested relief as those events are

22   largely within Mr. Hiles' control.

23      As to the fifth, and what *Lionel* identified as perhaps the most important factor –"whether

24   the asset is increasing or decreasing in value" – Mr. Hiles offers essentially no evidence at all.

25   Mr. Hiles asserts simply that (i) he has scheduled the Bend Property with a value of $12 million,

26   (ii) it was listed for sale pre-petition for about $11.9 million, and (iii) "to date no acceptable offers

27   have been received."  (Hiles Decl., ¶ 4) [Dkt. #32 at 12.]  Mr. Hiles offers no appraisal of the

28   Property.  Nor does Mr. Hiles offer any evidence of market factors or trends related to the Bend,

1  Oregon real estate market to suggest that the Property would decrease in value if it were not

2  immediately sold at a rushed auction – particularly one conducted without a reserve or minimum

3  floor price, as Mr. Hiles proposes.

4           **2.     The *General Motors* factors do not weigh in favor of the motion**

5           Mr. Hiles similarly fails to establish that the additional *General Motors* factors weigh in

6  favor of the requested relief.  In particular, as to the second *General Motors* factor ("will the sale

7  opportunity still exist as of the time of plan confirmation"), the answer is obviously yes: there will

8  always be an opportunity to conduct a naked auction sale with no reserve price if that is

9  determined to be in the best interest of the estate and creditors.  As to the third *General Motors*

10  factor ("how likely is it that there will be a satisfactory alternative sale opportunity or stand-alone

11  plan alternative that is equally desirable (or better) for creditors"), Mr. Hiles fails to establish that

12  it would be better for creditors to conduct a naked auction sale now, rather than to continue with

13  Sotheby's efforts to broker a bilateral, negotiated sale and, if such efforts prove unsuccessful for

14  Concierge, at a later date, to conduct an auction with either a stalking horse bid or a minimum

15  reserve price.  Mr. Hiles does not attempt to make a showing of the remaining *General Motors*

16  factors ("Does the estate have the liquidity to survive until confirmation of a plan" and "Is there a

17  material risk that by deferring the sale, the patient will die on the operating table?").

18           Accordingly, the balance of the applicable *Lionel* and *General Motors* factors weigh

19  against approving the proposed Section 363(b) sale of the Bend Property at this time.

20           **3.     Mr. Hiles has not satisfied Local Rule 6004-1(c)(2)(A)**

21           Local Rule 6004-1(c)(2)(A) requires that a motion for an order authorizing the sale of

22  estate property be supported by a declaration "establishing the value of the property and that the

23  terms and conditions of the proposed sale, including the price and all contingencies, are in the

24  best interest of the estate."  Here, Mr. Hiles' motion is supported only by his own declaration that:

25  (i) he has scheduled the Bend Property with a value of $12 million and (ii) it was listed for sale

26  pre-petition for approximately $11.9 million." [Dkt. #32 at 12.]   This does not satisfy the

27  requirements of Local Rule 6004-1(c)(2)(A).

28

**4.    The authorities on which Mr. Hiles relies are inapposite**

Essentially the sole argument and authority offered by Mr. Hiles in support of the motion is the assertion that, because the proposed sale would be by an "advertised public auction," that fact alone *a fortiori* establishes that the proposed auction and resulting sale price will provide fair value for the estate.    [Dkt. #32 at 4-9, in particular ¶¶ 8-11, 14, 17-19, 23-24, and 27-30.] However, none of the authorities cited by Mr. Hiles, *In re Onouli-Kona Land Co.*, 846 F.2d 1170 (9th Cir. 1988), *In re Gucci*, 126 F.3d 380 (2d Cir. 1997) and *In re Alpha Industries, Inc.*, 84 B.R. 703 (Bankr. D. Mont. 1988), support this proposition.    In each of those cases the issue presented was whether the eventual **purchasers** of property from the bankruptcy estate were protected from efforts to reverse the sales pursuant to 11 U.S.C. §363(m) on the basis that they had acted in "good faith" in the sale process.    *In re Onouli-Kona Land Co.*, 846 F.2d at 1172-74; *In re Gucci*, 126 F.3d at 387; *In re Alpha Industries, Inc.*, 84 B.R. at 705-06.

Thus, discussion in two of those cases from outside the Ninth Circuit (*In re Gucci* and *In re Alpha Industries*) to the effect that the purchaser's "good faith" pursuant to Section 363(m) depends in part on whether he or she purchased "for value" and that, having purchased at an auction generally "suffices to establish that the purchaser paid value," is irrelevant to the question presented by Mr. Hiles' motion herein. [3] Moreover, the court in *In re Onouli-Kona Land Co.* noted that within the Ninth Circuit, the "good faith" purchaser determination under Section 363(m) does <u>not</u> depend on a finding that it paid "value."    Accordingly, none of the authorities on which Mr. Hiles relies support the proposition that authority to conduct a Section 363(b) sale should be granted simply because the Debtor proposes to sell the property at auction.

---

[3] Further, both of those cases also note that courts have typically held that "fair value" is paid in a bankruptcy sale when the purchaser pays at least "75% of the appraised value of the assets." *In re Gucci*, 126 F.3d at 390; *In re Alpha Industries*, 84 B.R. at 706. Here, however, Mr. Hiles offers no evidence of the "appraised value" of the Property.

DOCUMENT PREPARED
ON RECYCLED PAPER

5.    **Courts that approved 363(b) motions did so under conditions not (yet)**

**satisfied by Mr. Hiles and denied such motions based on evidentiary**

**showings similar to Mr. Hiles'**

Multiple courts have denied Section 363(b) motions in circumstances comparable to those presented by Mr. Hiles.   For example, in *Lionel*, the court concluded that the evidence demonstrated there "was no good business reason for the present sale" of the bankruptcy estate's primary asset (a large block of corporate stock), because (i) the sale was "premature" in that the stock was "not a wasting asset" and the was no evidence of an "emergency" requiring an immediate sale and (ii) the proposed sale price was inadequate because the evidence indicated that the stock's value was not subject to wide market fluctuations and there was "no reason why those interested in [purchasing the stock] … would not be just as interested six months [later]." *In re Lionel Corp.*, 722 F.2d at 1070-1071.   So, too, in this case, Mr. Hiles has offered no evidence that the Bend Property is a "wasting asset" or that there is anything about the applicable real estate market to suggest that the Bend Property could not obtain as high or higher a price at auction at a subsequent time.

Similarly, in *In re W. Biomass Energy LLC*, 2013 Bankr. LEXIS 3166 (Bankr. D. Wyo. 2013), the court affirmed an objection to the sale by auction of substantially all of Debtor's assets for $525,000 on the basis that this was a "grossly inadequate" price, because it was less than 50% of the assets' current appraised value of between $1.07 - $1.28 million. *Id.* at *3 and *7-8. *See In re Crutcher Resources Corp.*, 72 B.R. 628, 632 (Bankr. N.D. Tex. 1987) (denying approval of a proposed 363 sale where the debtor offered no evidence on the value of the assets being sold other than the self-serving statements of the purchasers, who were insiders, and no evidence of business justification for the expedited transaction.)  Here, as noted, Mr. Hiles has offered no evidence of the Property's appraised value (only his statement that it was listed for sale at $11.9 million and his having scheduled it at a value of $12 million).  Instead, Mr. Hiles simply offers the blanket assertion that whatever the proposed auction results are will necessarily establish that the sale price is adequate.  Under these circumstances, approval for a Section 363(b) sale – and, in particular, a "naked" auction with no reserve or minimum floor price – should be rejected.

1      Moreover, instances where courts have approved Section 363(b) auctions involved

2  evidentiary showings that Mr. Hiles has failed to make.  For example, in *In re Boston Generating,*

3  *LLC*, an auction sale was approved in part because the Court determined that the sale price

4  provided fair value based on evidentiary findings that: (i) the auction was "heavily marketed," (ii)

5  there was a pre-petition bid from a "sophisticated party" that was "very close in amount" to the

6  final auction price, and (iii) the assets were decreasing in value such that a comparable sale

7  opportunity "probably will not exist" as of the time of plan confirmation.  440 B.R. at 323-24 and

8  328-29.  Here, in contrast, Mr. Hiles offers no evidence that the Property is decreasing in value

9  [Hiles Decl., ¶ 4; Dkt. #32 at 12], and the proposed Auction Agreement does not describe what

10  marketing activities Concierge is to undertake, requiring only the vague duty to conduct

11  "commercially reasonable marketing" [Brady Decl., ¶ 2 and Ex. 2 thereto at ¶ 2; Dkt. #32 at 17

12  and 29].

13      Similarly, in *In re New Millennium Management, LLC*, 2014 Bank. LEXIS 2825 (Bankr.

14  S.D. Tex. 2014), the court approved a Section 363(b) auction based on findings that: (i) evidence

15  was submitted not only that there had been prior efforts to market the property but of the **specific**

16  value of the offers received, (ii) the proposed auction would be conducted with a minimum

17  reserve price close to the proffered appraiser's estimate of the value of the property, (iii) there

18  was evidence that in the applicable real estate market online auctions tended to generate offer

19  prices as high as would bilateral negotiations, and (iv) there was evidence of a need to proceed

20  quickly because otherwise the secured creditor was going to seek relief from stay to immediately

21  proceed with a foreclosure.  *Id.* at *2-5.  This case presents a stark contrast, as Mr. Hiles' motion:

22  (1) does not set forth the value of prior offers for the Property, (2) does not contain any appraisal

23  of the Property, (3) proposes an auction without a reserve price, let alone one close to the

24  appraised value, (4) offers no evidence that auctions in this market tend to generate prices as high

25  as bilateral sales and (5) offers no evidence of exigent circumstances, such as an imminently-

26  threatened foreclosure.

27      Accordingly, Mr. Hiles' motion should be denied without prejudice at this time.

28  However, in the event that the Court determines to approve a Section 363 auction, it should

1    impose additional conditions on the sale process beyond those set forth in Mr. Hiles' motion, as

2    detailed further below.

3    **B.**    **Mr. Hiles Should Be Required To Obtain Either An Appraisal Or A Stalking Horse**

4    **Bid And Any Auction Should Have A Reserve Price Reasonably Related Thereto**

5    Mr. Hiles' conclusory assertion that a "naked" (no "reserve" or minimum floor price)

6    auction will necessarily produce fair value for the bankruptcy estate and creditors is inconsistent

7    with substantial authority. *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 661-62 (S.D.N.Y.

8    1992) (noting that there are certain advantages to selecting a stalking horse bidder, such as

9    establishing a minimum floor bid, which increases the chance that the eventual sale price will

10   reflect the true value of the assets); *In re Tex. Rangers Baseball Ptnrs*, 431 B.R. 707, 714 (Bankr.

11   N.D. Tex. 2010) (recognizing the "inherent benefits of having a stalking horse" bid in advance of

12   an auction of bankruptcy estate assets pursuant to § 363.)

13   Indeed, as detailed above, courts that have approved Section 363(b) auction sales have

14   often done so only in conjunction with protections for creditors that included one or more of (i) a

15   reserve price for the auction, (ii) a stalking horse bid or (iii) an appraisal. *In re Boston*

16   *Generating, LLC*, 440 B.R. 323-324 (holding auction price provided fair value in part because a

17   prior bid was "very close in amount" to the auction price); *In re New Millennium Management,*

18   *LLC*, 2014 Bank. LEXIS 2825 at *2-5 (approving auction because it would be conducted with a

19   minimum reserve price close to an appraiser's estimated value of the property); *In re Ashley River*

20   *Consulting, LLC*, 2015 Bankr. LEXIS 2268, at *15-16 and *24-26 (Bankr. S.D.N.Y. 2015)

21   (approving auction procedures that, among other things, included a reserve price set to reflect a

22   "reasonable balance" between the need to obtain a creditor/co-owner's approval of the sale of the

23   estate's primary asset and the goal to maximize the participation of potential bidders); *In re LDG*

24   *South, LLC*, 2010 Bankr. LEXIS 5291, at *5 and *10 (Bankr. M.D. Fla. 2010) (authorizing

25   auction where the proposed bidding procedures included a significant minimum reserve price.); *In*

26   *re Station Casinos, Inc.*, 2010 Bankr. LEXIS 5672, *35-37 (Bankr. D. Nev. 2010) (approving

27   motion for authority to conduct auction in part because Debtor had obtained a stalking horse bid,

28   the amount of which "provides an adequate floor from which to commence the Auction.")

1    Accordingly, the Court should deny Mr. Hiles' motion without prejudice or, alternatively,

2    order that the auction process/Bidding Procedures include a reserve price of at least: (i) 75% of

3    an appraised price or (ii) the amount of a stalking horse bid obtained or to be obtained by Mr.

4    Hiles' broker at Sotheby's.

5    **C.    The Proposed Auction Agreement Does Not Provide For Sufficient Marketing**

6    The authorities cited above granting approval for Section 363(b) auctions recognize the

7    critical importance to the protection of the estate and creditors of the auction being sufficiently

8    marketed to prospective purchasers. *E.g., In re Boston Generating, LLC*, 440 B.R. at 323-24 and

9    328-29 (auction sale approved because it was "heavily marketed.")   In this case, however, Mr.

10   Hiles' motion is not supported by any disclosure of a detailed marketing or advertising plan.

11   Instead, Mr. Hiles offers little more than: (i) the Auction Agreement's provision obligating

12   Concierge to undertake "commercially reasonable efforts to market" the Property [Dkt. #32 at

13   29], which marketing efforts are otherwise wholly undefined; (ii) Concierge's President's

14   declaration that there will be advertising of the auction, but which is wholly silent on what

15   advertising is actually planned [Dkt. #32 at 17, ¶ 2]; and (iii) Concierge's President's touting of

16   her firm's prior sales and "database of over 370,000 contacts in 211 countries." [*Id.* at ¶ 4.]   In

17   connection with a motion seeking approval of an Auction Agreement that would provide both a

18   $35,000 Engagement Fee and an additional commission of the larger of either $175,000 or 10%

19   of the sale price (which could result in Concierge receiving in excess of $500,000 or $1 million or

20   more that would otherwise be payable to creditors)[4], Mr. Hiles and the Court should require

21   Concierge to provide a far more detailed marketing and advertising plan before the Court

22   approves such an engagement.

23

24   ─────────────────────

[4]   While styled as a "buyer's premium," Concierge's fee is effectively paid by the seller (and,
25   thus, burdens the estate and creditors), as prospective purchasers inevitably reduce the amounts
     they would otherwise be willing to offer for the Property by the amount of the "buyer's premium"
26   payable to the auctioneer. *See* Michael Savage, "Explaining the Buyer's Premium, and a handy
     auction calculator," http://grumpyarthistorian.blogspot.com/2013/06/explaining-buyers-premium-
27   and-handy.html ("The buyer's premium is the fee added to the hammer price at auction, but don't
     be fooled by the term – it's really paid by the seller.  Buyers decide how much they want to pay,
28   and take off the premium to work out the maximum hammer price they're willing to bid.")

**D.     The Motion Fails To Justify Paying Full Commissions To Both The Auctioneer And A Broker**

In addition to Concierge, Mr. Hiles proposes to also employ Sotheby's, at an additional commission of 4% (if there is no buyer's broker) or 5% (on a split basis if there is a buyer's broker), as a real estate broker. [Dkt. #32 at 14, ¶ 14.] The motion fails to demonstrate good cause, however, for the employment of both Sotheby's and Concierge, especially at full commission rates of 10% to the auctioneer and an additional 4-5% to the broker.

Sotheby's has had the real estate listing for the Property since September 2015 and, according to Mr. Hiles' own account, has failed to obtain any "acceptable offers." [Dkt. #32 at 12, ¶ 4.] Indeed, it is this very lack of success by Sotheby's in finding an "acceptable offer" that, according to Mr. Hiles, warrants conducting an auction sale. [*Id.* at 13-15, ¶¶ 8 and 14-20.]

Moreover, the Declaration of Concierge's President touts not only her firm's advertising plan for the auction, but also that her firm's team "curates the world's most elite properties and matches them with qualified buyers," in part by hosting "a database of over 370,000 contacts in 211 countries." [Dkt. #32 at 17, ¶¶ 1 and 4.] The motion papers and supporting materials state repeatedly that Sotheby's would "coordinate" with Concierge, but that Concierge would not provide "brokerage services." [*Id.* at 14-15, 18 and 20.] However, no showing is made that the proposed auction reasonably requires the performance of any "brokerage services" by Sotheby's. In short, the motion does not answer the fundamental question of why, given the hundreds of thousands of dollars in fees to be paid to Concierge, it is necessary to incur hundreds of thousands of dollars more in commissions to the broker who has previously been unable to sell the Property, in light of Concierge's claimed experience in "curat[ing] the world's most elite properties and match[ing] them with qualified buyers," its marketing to its "database of over 370,000 contacts," plus its planned public advertising?

**E.     If A 363 Sale Is Permitted, The Net Proceeds After Payment Of Sales Costs, Property Taxes And The Secured Creditor Should Be Escrowed Pending Plan Confirmation**

Mr. Hiles' motion is wholly silent on the planned disposition of the balance of the sales proceeds net of payment of sales expenses (auctioneer and/or broker's fees), property taxes and

1    the secured creditor Bank of America. [Dkt. #32 at 7-11.] Given the circumstances (in particular,

2    Mr. Hiles' prior unilateral withdrawal and payment to himself of funds from the FIE Trust

3    Account), FIE submits that it any order permitting a Section 363 sale of the Property should

4    expressly provide for compliance with Local Rule 6004-1(h), and expressly provide that none of

5    the net proceeds of a sale of the property (after payment for sales expenses, property taxes and to

6    the secured creditor Bank of America) may be disbursed to Mr. Hiles or for payment of any

7    personal expenses of Mr. Hiles, absent a further order of this Court authorizing disbursement.

8    *See, e.g.,* *In re Walter*, 83 B.R. 14, 17-20 (9th Cir. BAP 1988) (affirming restraining order granted

9    in favor of unsecured creditor precluding debtors, pursuant to Section 363, from using bankruptcy

10   estate property for payment of "personal living expenses for debtors and their families" and/or for

11   "payment of attorneys' fees which benefitted the debtor as an individual, but not the bankruptcy

12   estate," because such withdrawals could jeopardize "a substantial asset of the estate.")

13          Numerous authorities that have permitted bankruptcy estate property to be sold pursuant

14   to Section 363(b) have held it appropriate to protect creditors by conditioning approval of such

15   sales on the Debtor not distributing any of the proceeds until a plan is confirmed and, in the

16   interim, maintaining such proceeds in an escrow account. *In re Conroe Forge & Manufacturing*

17   *Corp.*, 82 B.R. 781, 786-787 (Bankr. W.D. Pa. 1988) (ordering the balance of the proceeds of a

18   Section 363 sale net of approved broker fees be "escrowed at interest pending confirmation" of a

19   bankruptcy plan); *In re Air Beds, Inc.*, 92 B.R. 419, 422-424 (9th Cir. B.A.P. 1988) ("We find

20   that the *Conroe* approach strikes the proper balance between the power to sell assets of the estate

21   other than in the ordinary course of business and the requirements of Chapter 11. …If distribution

22   of assets occurs before confirmation there will exist no means by which a plan may be

23   implemented, in contravention of 11 U.S.C. § 1123(a)(5). …," and therefore holding that it was

24   an abuse of discretion to permit disbursement of the proceeds of a Section 363 sale in advance of

25   plan confirmation to pay debtor's tax claims.); *In re Chateaugay Corp.*, 973 F.2d 141, 143-145

26   (2d Cir. 1992) (affirming bankruptcy court's order approving Section 363 asset sale that provided

27   the proceeds be "deposited in an escrow account and distributed only in accordance with a

28   confirmed plan"); *In re  Boston Generating*, 440 B.R. at 330 (allowing Section 363 sale but

1    conditioned on proposed sale order providing for distribution of proceeds only to secured

2    debtholders, with an express provision requiring "holdback" of the balance of the funds to

3    "ultimately fund distributions" following plan confirmation); *In re Ashley River Consulting, LLC,*

4    2015 Bankr. LEXIS 2268, at \*27 (Bankr. S.D.N.Y. 2015) (In order approving proposed 363 sale

5    process, the Court also directed that "[i]f a sale of the [property] is successful, proceeds of the

6    sale will be held in escrow pending a later determination of how they will be distributed pursuant

7    to a confirmed chapter 11 plan....")

8            Further, given that the Property that is the subject to this motion represents over 75% of

9    the claimed value of the estate's assets, not conditioning the sale in manner that expressly

10   precludes Mr. Hiles, as Debtor-in-Possession from disbursing any portion of the net proceeds to

11   himself or for payment of any personal expenses in advance of plan confirmation would result in

12   establishing the terms of the plan *sub rosa* to the prejudice of creditors, such as FIE. *See, e.g., In*

13   *re Defender Drug Stores, Inc.,* 145 B.R. 312 (9th Cir. BAP 1992) ("When preconfirmation

14   transactions, such as the sale of substantially all of the debtor's assets, have the effect of or dictate

15   the terms of a future reorganization plan, some courts have required the debtor to provide

16   creditors with the protection they would have received in the confirmation process."); *In re*

17   *Continental Air Lines, Inc.,* 780 F.2d 1223, 1227 (5th Cir. 1986) ( "§ 363 does not authorize a

18   debtor and the bankruptcy court 'to short circuit the requirements of a reorganization plan by

19   establishing the terms of the plan *sub rosa* in connection' with a proposed transaction," because

20   "creditors' rights under, for example, 11 U.S.C. §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) might

21   become meaningless.")

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, FIE respectfully requests that Mr. Hiles' Motion [Dkt. #32] be denied without prejudice and that FIE's objection to Mr. Hiles' Notice of Sale [Dkt. #34] be sustained.

Dated:  August 30, 2016

PETER H. MASON
JOSHUA D. LICHTMAN
REBECCA J. WINTHROP
**NORTON ROSE FULBRIGHT US LLP**


By   */s/ Rebecca J. Winthrop*
REBECCA J. WINTHROP
Attorneys for Creditor
FARMERS INSURANCE EXCHANGE

## DECLARATION OF PETER H. MASON

I, Peter H. Mason, declare and state:

1.      I am an attorney, licensed to practice before all courts in the State of California.  I am also a Partner in the law firm of Norton Rose Fulbright US LLP, attorneys of record for Farmers Insurance Exchange ("FIE") in connection with the bankruptcy proceeding initiated by Debtor Russel Dennis Hiles III ("Debtor" or "Mr. Hiles").  Unless otherwise noted, the matters testified to herein are based upon my own personal knowledge, and if called as a witness, I could and would competently testify thereto under oath.

2.      I was lead counsel for FIE in the AAA arbitration proceeding *Farmers Insurance Exchange v. Russel D. Hiles, et. al*, Case No. 01-14-002-3063 (the "Arbitration").

3.      Mr. Hiles is an attorney residing in Palm Desert, California, who previously managed a portion of FIE's litigation caseload pursuant to a Litigation Management Agreement (the "LMA") between Mr. Hiles and his law firm, Hiles & Associates, LLP, which previously did business under the name Hiles Borgeson (referred to collectively with Mr. Hiles as "Hiles").

4.      In the fall of 2014, a dispute arose between Hiles and FIE related to the LMA, part of which concerned a dispute as to the ownership of approximately $5.2 million that Hiles was required to keep in an FIE client trust account pursuant to the LMA, and Hiles' rejection of FIE's request for an accounting as to the disposition of those funds.  In accordance with the dispute resolution terms of the LMA, FIE initiated the above-referenced arbitration proceeding (the "Arbitration") on December 29, 2014, alleging claims for, *inter alia*, breach of fiduciary duty and misappropriation of client trust funds. The Arbitration hearing was conducted on January 4-8, 2016.

5.      On May 27, 2016, the arbitrator issued a "Partial Final Award" in favor of FIE and against Hiles, and on July 19, 2016, issued a Final Award in favor of FIE and against Hiles on the issue of attorneys' fees.  True and correct copies of the May 27 and July 19, 2016 arbitration Award(s) are attached hereto as Exhibits 1 and 2.  Collectively, those Final Award(s) resolved all claims and counterclaims in the Arbitration and directed Hiles to pay to FIE the total amount

1   $5,540,747.70 (inclusive of pre-judgment interest calculated through May 27, 2016). [Ex. 1 at 35

2   and Ex. 2 at 39.]

3       6.    Among the grounds for the Award(s), were the arbitrator's determination that, on

4   November 17, 2014, Mr. Hiles "wrongfully took from the Trust Account" the sum of $2,533,291

5   that belonged to FIE, and did so without notice to or permission of his client FIE. [Ex. 1 at 29

6   and 35.] The arbitrator also concluded that Mr. Hiles breached his fiduciary duty to FIE by

7   intentionally diverting to himself at least $980,1892.70 from the Trust Account that he was, under

8   the LMA, required to use to pay outside counsel fees incurred on behalf of FIE (and that FIE

9   subsequently was required to pay to those outside counsel because Mr. Hiles had failed to do so).

10  [*Id.* at 32-33 and 35.]    Further, the Arbitrator determined that Mr. Hiles had breached his

11  fiduciary duty to his client FIE by intentionally refusing to provide FIE with an accounting of the

12  LMA and Trust Account records and funds upon request in September 2014, forcing FIE to incur

13  the attorneys' fees necessary to pursue the Arbitration. [*Id.* at 32 and 35.]

14      7.    During and after the Arbitration proceedings, however, FIE learned of further facts

15  suggesting that Mr. Hiles had taken steps to dissipate assets and that raised concern he was

16  attempting to place assets out of reach of FIE and other creditors.  For example, FIE learned that,

17  on or about May 5, 2015, Mr. Hiles had executed a Grant Deed purporting to transfer all right,

18  title, and interest in real property located at 155 Metate Place, Palm Desert, California 92260 (the

19  "Palm Springs Property") – which he owned as an individual – to his wife for no consideration. A

20  true and correct copy of that deed is attached hereto as Exhibit 3.  As reflected in those records,

21  however, Mr. Hiles, did not record the Grant Deed effecting the no-consideration transfer until

22  May 18, 2016—a week after entry of the interim Arbitration award against him. [*Id.*]

23

24

25

26

27

28

1        8.    Mr. Hiles also testified in the Arbitration [a true and correct copy of a portion of

2    the testimony therein is attached hereto as Exhibit 4] that he planned to transfer the Bend Property

3    to his wife in the near future. [*Id.* at 919:22-920:8.]

4        I declare under penalty of perjury under the laws of the United States that the foregoing is

5    true and correct.

6        Executed this 30th day of August, 2016 in Los Angeles, California.

7

8

9                                            _____

10                                           PETER H. MASON

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

### No. 01-14-0002-3063

---

Farmers Insurance Exchange,

    Claimant,


and


Russel D. Hiles; Hiles Borgeson LLP,

    Respondents.

---

And related counterclaims.

---

## PARTIAL FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement contained in the Litigation Management Agreement entered into between the above-named parties in or around March 2007, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered an Interim Award dated May 10, 2016, do hereby issue this PARTIAL FINAL AWARD as follows:

The liability and damages phases of the hearing were held on January 4 – 8, 2016 at the Los Angeles office of the American Arbitration Association. The parties stipulated to the confidentiality of these proceedings, and all documents produced in connection therewith. At the close of the hearing, the parties further stipulated that the issue of prevailing party attorney's fees will be reserved for post-Award submissions.

Peter H. Mason and Joshua D. Lichtman of the Los Angeles office of Norton Rose Fulbright US, LLP represented claimant/counter-respondent Farmers Insurance Exchange ("**Farmers**" or "**FIE**").

Respondents/counterclaimants[1] were initially co-represented by Michael J. Bidart and Ricardo Echeverria of Shernoff Bidart Echeverria Bentley LLP, Claremont, California ("the Shernoff firm") and David M. deRubertis and Kelly A. Knight, The deRubertis Law Firm, APC of Studio City, California ("the deRubertis firm"). Prior to the hearing, Russell D. Hiles of Hiles & Associates, LLP and Hiles Borgeson, LLP, Rancho Mirage, California took over as counsel for respondents/counter-claimants Russel D. Hiles and Hiles Borgeson LLP ("**Mr. Hiles**" and "**the Hiles firm;**" jointly referred to herein as "**Hiles**" unless the context dictates otherwise).

Fact Witnesses:
     Russel D. Hiles, Esq.
     Bryan Murphy, Esq.
     Jeffrey Hathaway, Esq.
     Steve Thompson
     Victor Aguilera

Expert Witness:
     Heather Rosing, Esq.

I.    <u>FACTS</u>.

Around November 2006, Farmers solicited proposals from Hiles, among others, to take over daily management and decision-making concerning FIE's outside counsel who handled the Farmers' litigation caseload that was referred to in-house as Suits Against the Exchange ("SAE"). Until then, SAE were handled in-house, but Farmers believed it could achieve cost-savings by out-sourcing this function. In December 2006, Hiles was informed that he had been chosen to manage the SAE claims.[2] Between January and March 2007, Bryan Murphy ("Murphy") and Hiles began negotiations for what would eventually be the Litigation Management Agreement ("LMA") [Ex.

---

[1] The parties could not agree on the actual identities of the proper respondents in this matter. FIE named "Russel D. Hiles, an individual, and Hiles/Borgeson, as successor to Hiles & Associates, LLP" as respondents in its Demand and Amended Demand. The deRubertis and Shernoff firms answered and counterclaimed on behalf of "HILES & ASSOCIATES, LLP, a Limited Liability Partnership and HILES BORGESON, LLP, a Limited Liability Partnership." The Litigation Management Agreement ("LMA") entered into between the parties and operative in this proceeding identified FIE's counter-party as "Hiles & Associates, a California LLP ('Hiles')." It was signed by Russel D. Hiles. When he submitted his Witness List and prehearing brief, *in pro per* and as counsel for his firm, Mr. Hiles identified his clients as "RUSSEL D. HILES, an individual, and HILES/BORGESON, as successor to Hiles & Associates, LLP," the same manner in which respondents had been named in FIE's Demand. Hiles testified that Hiles/Borgeson was a dba of Hiles & Associates, so named to reflect his partnership with Chris Borgeson for the purpose of operating under the LMA.

[2] According to Hiles, he was asked by Bryan Murphy to submit a proposed contract for Farmers to review. Hiles contends that the contract he submitted was reviewed and signed by both Murphy and Hiles. However, neither party was able to produce that contract, and Farmers denies its existence, so it must be treated as a legal nullity.

4].[3],[4] According to Hiles, Murphy assured him that he would work with Hiles if any provisions were too onerous,[5] and Hiles signed it on March 17, 2007. Murphy assigned Victor E. Aguilera, Assistant Vice President ("Aguilera"), to be Farmers' point-man with Hiles under the LMA.

The first year of the contract ran from April 1, 2007 to March 31, 2008. While the LMA provided in §2.2 that FIE had the right to extend the term by two additional years, Farmers ended up extending it for 3 additional years. [Ex. 32]

Under the LMA, Hiles-Borgeson was to perform coordinating counsel litigation management services on Farmers' SAE cases. The LMA reserved to Farmers' in-house staff all rights and responsibility to handle indemnity decisions on the litigated case files. After evaluating cases with outside counsel, Hiles would obtain authority from Farmers to resolve these cases. Paragraph 3.1, inter alia, referred to FIE as Hiles' client.

The LMA provided for certain monthly payments to Hiles for in-house staff, rent and other overhead ("Unallocated Loss Adjustment Expense" or "ULAE") and for payments to outside counsel handling the Farmers SAE caseload ("Allocated Loss Adjust Expense" or "ALAE").

In order to incentivize Hiles to help Farmers achieve cost savings on its outside counsel (ALAE) fees, the LMA §8.2 (c)(iii) provided that Hiles would receive a percentage of Farmers' savings on its outside counsel expenditure. For the first year, Hiles was allowed to retain, as profit, up to 20% of the ALAE residual ("the Profit CAP"). The profit CAP was later adjusted downwards to limit Hiles' share of Farmers' savings to $7 million, then $6 million, then $5 million [Ex. 32] of the ALAE residual.

Additionally, Hiles was required keep $5.2 million in trust, and to get Farmers' approval before taking money from the Trust Account to pay himself a profit §8.2(b), so that if Hiles ever failed, there would be a reserve of money to pay all of the bills and debts incurred on behalf of Farmers. Hiles opened a trust account at the Bank of America across the street from his office. Hiles kept a reserve of $5.2 million in that account except to the extent Murphy gave him written permission to use up to $1 million for up to 30 days to advance payment to outside counsel on a different caseload that Hiles began to handle for FIE known as CAT, or large catastrophe, files. [Ex's 28, 36 and 37]

While the parties agree that Hiles deposited $2.6 million of his own funds, they disagree as to whose money was used to fund the other $2.6 million of the trust account.

During the 8th and final year of the extended term of the LMA, Murphy was named President of Farmers Small Business Company and Aguilera left Farmers and retired. Murphy was replaced by Keith Daly and Jeff Hathaway replaced the retiring Aguilera. Around the same time, Hiles had

---

[3] LMA §1.3(f) states that FIE and Hiles drafted the agreement jointly, and that it should not be construed against either party.

[4] The earliest drafts were simply called SAE Outsource Draft Agreement [Ex. 1, 2].

[5] Indeed, on numerous occasions Murphy and Hiles did modify the signed Farmers contract. For example, in June 2008, the parties agreed, inter alia, to a 2% cost of living increase for both ALAE and ULE [Ex. 19]. In May 2009, following a back-and-forth negotiation, they agreed that Hiles would accept several hundred additional case files per year, maintain the existing level of ALAE payments, and accept a reduction in the monthly ULAE payments. [Ex. 22]

been assigned an additional 444 files, for which he believed he was entitled to significant additional compensation. Hiles' attempts to reach his new contacts to discuss payment were initially unsuccessful. When he did, the two sides were not able to reach an agreement on the compensation issue. Several months later, however, a check for approximately $2,367,000 was sent to Hiles, who deposited it but deemed it unacceptably low for the additional cases. Farmers then moved the last-assigned 444 files in-house.

In September 2014, Hathaway advised Hiles that Farmers was not going to renew his contract. Soon thereafter, Hiles was told that all of his case files would be transferred electronically on September 29, 2014, which was effectuated overnight. Farmers paid Hiles two extra months of ULAE, even though he was no longer managing any caseloads nor overseeing outside counsel, as well as an extra month of ALAE.

Believing Farmers had breached the LMA by terminating him with no notice, and further believing that all of the money in the trust account belonged to the Hiles firm, Hiles transferred the $4.5 million then in the trust account to the Hiles Operating Account. He used that money to pay staff, rent, outside counsel and vendors as well as $2,150,000 to finish building his retirement home in Oregon and pay income taxes for the previous year of approximately $2.5 million. There was no longer enough money to pay all of Farmers' outside counsel.

Both sides seek monetary damages as well as attorney's fees and punitive damages.

While Hiles initially asserted that the LMA was an unconscionable contract of adhesion and therefore unenforceable, Ex's 1 – 3 are evidence that negotiations between the two sides were ongoing over a period of at least two months, and Hiles in his Response to Farmers' Post-Hearing Brief conceded its enforceability.

## II.   THE PARTIES' CLAIMS.

### A.  FIE'S CLAIMS

> Accounting; Specific Performance.

> Breach of Contract; Breach of Implied Covenant; Breach of Fiduciary Duty and Contractual Indemnity.

> Conversion; Unjust Enrichment, Constructive Trust.

> Professional Negligence.

Many of Farmers' allegations against Hiles are common to two or more of Farmers' claims, and are set forth generally below:

- Failing to pay fees due to Retained Counsel;
- Failing to timely provide requested records and to honor Farmers' audit rights;
- Mishandling Farmers' client trust funds, including conversion/failing to return to Farmers upon the non-renewal of the LMA the portion of the funds in the Trust

Account that Farmers had deposited and secretly withdrawing those funds and disbursing them to Hiles without notice to or consent from Farmers;

- Accepting, and failing to notify Farmers of, mistaken payments or overpayments to which Hiles was not entitled under the LMA;
- Accepting, and failing to notify Farmers of, funds paid to or retained by Hiles in excess of the applicable year's contractual Profit Cap;
- Soliciting and/or accepting unwarranted modifications of the contractual Profit Caps for years 6, 7 and 8;
- Withholding at least $900,000 of Farmers' money that was to have been used to pay fees due Retained Counsel;
- Hiles' retention of a $300,000 overpayment for LMA contract year 3;
- Hiles' retention of a $2.3 million overpayment for LMA contract year 6;
- Hiles' retention of overpayments for contract year 7 totaling $3.05 million; and

## B.   HILES' COUNTERCLAIMS

> **Breach of LMA: Failure to pay for handling of CAT files.**

Hiles contends he was owed $900,000 for the Hiles firm's fees and expenses incurred in connection with the handling of certain CAT files, and that as a result, he withheld $900,000 of Farmers' ALAE payments to him instead of paying outside legal counsel that amount.

> **Failure to compensate for the excess 444 files assigned in year 7.**

Although Hiles initially contended that Farmers owed him compensation for the additional 444 files it assigned him in year 7, he apparently was persuaded at the hearing that the $2.367 million payment he received from Farmers in year 8 was on account of those files. In his Response Brief at p. 16, Hiles accepts as sufficient Farmers' payment of $2.367 million for the excess files Farmers assigned him in year 7.

> **Breach of LMA—Wrongful Early Termination.**

Hiles maintains that Farmers terminated the LMA prematurely and without cause, and as a result, that the Hiles firm is owed 4 months of ALAE payments and 2 months of ULAE payments under §§ 6 and 7 of the LMA.


## III.   ANALYSIS.

Much turns on my assessment of the credibility of Mr. Hiles' testimony as well as my perception of him as a whole person, for there were a number of factual disputes concerning what was promised to him, and what concessions were made by Farmers. He is a beguiling gentleman—generally easy-going, charming, self-deprecating, earnest and intelligent. While he may, during

the time covered by the disputes herein, have been naïve, I cannot find that he is a liar.[6]

Even when asked by the arbitrator whether, if he had billed a client $10,000 and the client had mistakenly sent two separate payments of $10,000, he would be obliged to repay the client $10,000, and seeing that an affirmative answer to that hypothetical could potentially cost him millions of dollars, rather than try to distinguish the two situations or otherwise defend himself, Hiles replied sheepishly, "I've gotta think about that—I'll get back to you."[7]

Steve Thompson ("Thompson"), who had been the Operations Manager for the SAE Group ("Suits v. the Exchanges") since 2002, sent out monthly spreadsheets, which he first reconciled with the Hiles firm's office manager, showing how well the LMA arrangement was working out from Farmers' perspective.

In support of its claims for conversion and breach of fiduciary duty and for an award in its favor of punitive damages, Farmers argues that Hiles, or at least the Hiles firm, was paying close attention to the implementation of the financial aspects of the LMA and argues that Hiles spoke up when an error was made in Farmers' favor, but not when an error was made in favor of the Hiles firm.

Farmers notes that in May, 2009, when Aguilera sent Thompson's profit calculation for the prior year to the Hiles firm, Hiles immediately contacted Aguilera to note an error in Thompson's calculations [Ex. 24]. By treating the prior year's profit cap as $33.0 million instead of the actual $33.6 million, Thompson had underestimated the Hiles firm's 20% of the profit cap as $547,322 instead of $667,322. When errors were made in Thompson's profit cap calculation that benefited the Hiles firm, Farmers points out, Hiles never notified Farmers.

While Hiles had a surprisingly good grasp of the financial details of the LMA, he was clearly not on top, on a daily basis, of these details. He relied on his office manager, Marlene, to track the firm's numbers and to send them to the firm's accountant, which she did. I believe his testimony that it was his erstwhile partner Chris Borgeson who pointed out the underpayment that Hiles immediately asked Farmers to correct.

I believe Hiles' testimony that neither he nor Marlene assessed, or "crunched," the numbers that went into the P&L she sent off to the accountant. Had he or Marlene analyzed the Hiles' firm's own P&L, Hiles would have known that what he thought was Hiles firm profit was only denominated "profit"[8] on Thompson's spreadsheets [Ex. 82] for purposes of identifying the amount of outside defense fees his firm had saved Farmers under the LMA, and had nothing to do

---

[6] How many trial lawyer-defendants would waive the opportunity to review their own deposition transcripts and make niggling corrections? Hiles, in his guileless manner, upon being asked the routine questions that precede cross-examination, testified at the hearing, "I said what I said, and I trust the court reporter took it down correctly." [TR 545.]

[7] The official transcript does not contain this exchange, perhaps because the court reporter was not aware that it was on the record. The arbitrator's hearing notes do contain this exchange, and she herself specifically recalls it.

[8] In point of fact, the LMA used the term "ALAE Fee Residual" to identify the pool of funds from which Hiles was initially allowed to retain no more than 20%.; what Thompson referred to as "profits" was really *savings* Farmers was able to achieve by transferring its litigation management to Hiles.

with the Hiles firm's profitability.[9]

Thus when the music stopped—when Hiles stopped getting FIE advance ALAE payments with which to pay Retained Counsel fees —the firm was left with no retained earnings, lawyers' and vendors' bills and insufficient funds to pay them.

A review of the Hiles firm's financial statements at a few points in time is revealing. For example, Ex. 6 contains the May 2007 financials. At that time Hiles was spending $1,380 per month for his auto, he and Borgeson were taking $30,000 a month each in "guaranteed expenses," and the firm showed a profit of $77,444.67.

A year later in May 2008, Hiles' monthly auto expenses had more than doubled to $3,261, he and Borgeson were each taking $40,000 a month in "guaranteed expenses" on top of the $1 million each had withdrawn in October 2007. [Ex. 9]. The firm showed a net loss of $442,410 for the month, and a $2,378,580 loss for the first 5 months of 2008 [Ex. 18].

By August 31, 2014 the firm's Balance Sheet showed current liabilities of $6,168,312, and equity of ($868,732).

So Hiles' testimony -- that when he received the Thompson spreadsheet at the end of each contract year, he and his partner gave their staff a generous bonus and then split the balance -- was particularly cringe-worthy.


### A. Was an Attorney-Client Relationship Created by Virtue of the LMA?

The Hiles firm oversaw a fleet of outside counsel, taking over some of the adjustor functions previously performed in-house by Farmers, so it is not surprising that Hiles asserted that its role was not purely that of counsel, but was instead that of a Third Party Administrator ("TPA"). But there were numerous provisions in the LMA,[10] the correspondence between the parties, as well as the actions of the parties, that made clear that the relationship was also one of attorney and client. For example, §§ 3.6 (d) and 15.2 of the LMA [Ex. 4] recited that an attorney-client relationship was created between Hiles and Farmers, and that Hiles could hold itself out as Farmers' "legal representative." In order to perform under the LMA, Hiles was required to purchase "legal malpractice insurance." [Id., §13.1]

---

[9] Even at the end of the hearing, Hiles was still conflating Farmers' attorney's fees residuals, or savings, and profits: "The first year's actual profit was $9.7 million dollars." Hiles Brief dated January 7, 2016, p. 11.
[10] Examples of the type of legal services Hiles performed for Farmers under the LMA included:
- selection of outside counsel;
- lawsuit evaluations;
- liability and damages analysis;
- settlement recommendations;
- development of legal strategies; and
- working with outside Retained Counsel.
[Ex's. 4, 21, 25, 39, 40, and 78].

Farmers' legal ethics expert, Heather Rosing, Esq., testified that the LMA is an unambiguous attorney engagement letter. [TR 4:190 -191] In his Response to Farmers' Post-Hearing Brief, Hiles conceded that the LMA created an attorney-client relationship, but maintained that at all times he comported himself accordingly.

It is thus undisputed that an attorney-client relationship was formed under the LMA.

### B. Did Hiles Accept a $600,000 ALAE Overpayment in Year 1 and Fail to Report the Overpayment to Farmers?

LMA ¶8.2 (a) calls for six (6) monthly ALAE payments of $3.3 million, followed by six (6) monthly payments of $2.6 million in the first year. In fact, Farmers paid Hiles six (6) monthly payments of $3,333,333 followed by six (6) monthly payments of $2,666,666, a difference of $600,000. Farmers claims that the difference was a pure oversight, and that Hiles had a fiduciary obligation to report the overpayment and return it to Farmers under three theories—unjust enrichment, constructive trust and breach of fiduciary duty.

In response to his attorney's straightforward question, "Was the LMA supposed to guarantee a profit to Hiles' firm?" Murphy answered, "No." . But, as if going off-script, Murphy interrupted his attorney's next question to add, "I mean, in fairness, though, for the deal to work, he needed to make some sort of profit, right?" [TR 173 – 4]

I sensed some waffling on Murphy's part when his attorney asked him point blank: "Did Mr. Hiles ever tell you that the amounts that were listed in Exhibit 4 at paragraph 8.2(a)(i) were wrong?" Rather than answering with his customary authority and certainty, Murphy replied, "Not that I recall, no." [TR 178]

Hiles, on the other hand, testified that Murphy's plan for the first 6 months had always been to pay Hiles the same monthly ALAE amount that it had previously paid its outside counsel--$40,000,000 per year for the first six months ($3,333,333/month), followed by a 20% reduction to $32,000,000 per year ($2,666,666/month) for the next 6 months. Hiles further contends that Murphy purposely ordered checks in those amounts, and testified that he even discussed the overpayments with Murphy at the end of the 12 months. Such testimony, if believed, would negate the element of mistake required for the imposition of a constructive trust.

How could clear contract terms not be followed without someone instructing the person writing the checks to vary from the written amount? It is inconceivable to me that *ab initio*, Farmers sent checks in the wrong amount for 12 months.

Hiles offered what I consider to be a more plausible explanation. Rather than a scenario whereby Farmers simply made the same mistake 12 months in a row, notwithstanding all the internal documentation provided to Murphy's managers, and not one person noticed the mistake, Hiles theorized that the legal department did the math wrong in the first place, when they drafted ¶8.2 (a) (1). According to this theory, Murphy told Hiles he was going to start him for 6 months at the same rate--$40 million per year—that Farmers had been paying outside counsel—and that the

Farmers attorney who drafted the LMA divided $40,000,000 by 12 and got the wrong number--$3,300,000 instead of $3,333,333. I believe Hiles and Murphy had a meeting of the minds on the big picture, and that neither one noticed that in the translation from annual to monthly, the numbers were off.

Based on the foregoing, I find that Farmers intended to pay the $600,000 to Hiles in Year 1, and that the $600,000 was not an overpayment.

### C. To whom did the $2.5 Million in the Trust Account belong?

FIE claims they left $2,533,291 on deposit as a favor to Hiles, to help him fund the $5.2 million reserve required under the agreement. Hiles, on the other hand, testified that Murphy had told him that he was so impressed by the amount of "profit" Hiles had made that first year, and that since there was a $9+ million profit on ALAE, Murphy offered to waive the cap if Hiles would leave his own $2.5 million "profit" in the trust account to cover the reserve requirement. [TR 19]

Thompson testified that while Hiles made Farmers a total profit of $9,733,290 the first year, Aguilera advised him that $5 million of the first year's profit would be held in trust, and so he documented the profit as being only $4,733,290 [TR 39 – 40, 127 – 8], and bracketed the balance of the $5 million and made a notation, "Held in Trust." Thompson's testimony does nothing to resolve the dispute as to whether Farmers meant to gift its $2.5 million to Hiles at such time as the relationship ended and the reserve account could be disbursed, or whether it expected that money to be returned.

Because I found Hiles to be honest, I believe that he believed that Murphy meant to waive the profit cap for Year 1. I also believe that he misunderstood Murphy, who testified that Farmers had not gifted its $2.5 million to Hiles.

While the trust account was maintained at approximately $5 million until then, in October 2014, Hiles withdrew $1.9 million from the trust account and paid himself at least $1.5 million. [Ex. 56] In November, he completely depleted the remaining $3 million, transferring it all into his firm's operating account, and then spending it, paying himself another $2.5 million. [Ex. 60]

I therefore find that Hiles wrongfully took Farmers' $2,533,291 from the Trust Account on November 17, 2014, but that he did so mistakenly and not with intent to convert Farmers' funds. Farmers is entitled to prejudgment interest of 10% on $2,533,291 from November 17, 2014. [Ex. 59]

### D. Did Hiles Accept a $280,000 Overpayment in Year 3 and Fail to Report the Overpayment to Farmers?

It is undisputed that Farmers inadvertently overpaid Hiles in the sum of $280,000 in Year 3, and is entitled to recover that sum from Hiles. Since I credit Hiles' testimony that he was not aware of the Year 2 underpayment until it was brought to his attention by his then-partner, I find no breach of fiduciary duty in not reporting the Year 3 overpayment to Farmers.

Since the overpayment was not brought to Hiles' attention until the instant proceeding, I decline to award prejudgment interest on the $280,000.

### E. Did Hiles Wrongfully Accept a $500,000 Overpayment in Year 6 and Fail to Report the Overpayment to Farmers?

It is undisputed that the parties agreed in the 1st Addendum to the LMA to limit the profit cap in Year 5 to $6 million and to $5 million in years 6 – 8. [Ex. 33] Further, in March 2012, they agreed that the ALAE payment for year 6 would be increased by $593,750/month, and that the intake target for new file assignments for that year would be 1,440 files. [Ex. 38] The profit cap remained the same. Subsequently other LMA modifications were made. [Ex's 32, 33]

Thereafter, in April 2013, Hiles and Aguilera engaged in an e-mail exchange in which Hiles mistakenly "confirmed" that the profit cap for year 7 would "remain at $6 million" and Aguilera agreed [Ex. 43]. Hiles created another misunderstanding when he 'confirmed' that the profit cap for year 7 would 'remain' at $6 million, implying that the cap for year 6 was also $6 million. Hiles admits that the utilization of $6 million instead of $5 million was a mistake, and that he owes $500,000 to Farmers for year 6.

It is clear that under the theories of unjust enrichment and imposition of constructive trust asserted by Farmers, Farmers is entitled to the return of monies wrongly held by Hiles by virtue of the mistaken profit caps utilized by Farmers in year 6.

I decline to accept Farmers' assertion that Hiles' negotiation of a fee modification with his client violated Rule 3-300 because it was not fair and reasonable. There is no evidence that it was not fair to Farmers. Indeed, as noted above, Murphy testified that the LMA had to work for both sides.

I therefore find that Farmers is entitled to the return of $500,000, plus prejudgment interest from June 10, 2013.

### F. Is Hiles entitled to the 50/50 split of the excess over the profit cap he received in Year 6?

In contrast to errors made by Farmers, to which he readily acknowledges Farmers is entitled, Hiles contends that the 50/50 split of the excess over the profit cap he received in year 6 is his to keep.

In March 2012, the parties negotiated an increased cap of 1,444 files and an increase in ALAE payments by $593,750/month. [Ex. 38]

In year 6, there were 648 new cases assigned to Hiles, exceeding by 204 the cap agreed to the prior March. As a result, Hiles contends the parties agreed to additional compensation for the increased intake in the form of a 50/50 split of ALAE residual that exceeded the profit cap. [Ex's 41 and 43]

Farmers, on the other hand, asserts that having failed to advise Farmers to seek independent counsel prior to changing the fee arrangements, and entering into a contract modification that

benefited only Hiles, Hiles is not entitled to the benefit of the 50/50 split under California RPC 3-300, which requires that a transaction be fair and reasonable to Farmers.

Farmers failed to sustain its burden of proving that the Year 6 profit cap split was not fair to Farmers. While it cherry-picked testimony excerpts showing that Hiles did not 'need' a share of the excess profits, it failed to substantiate that the attorney's need is the basis for determining whether an arrangement he or she makes with a client is fair and reasonable. On the contrary, having heard the testimony of Murphy, Aguilera and Thompson, and read their contemporaneous e-mails, I am convinced that if Farmers believed a requested increase in compensation to Hiles was unreasonable, it would not have happened.

I therefore find that Hiles was entitled to the 50/50 split of the excess over the profit cap he received in year 6.

### G. Is Farmers Entitled to Recoup the Additional $2.367 Million it Paid Hiles in Year 7?

As noted *supra*, in year 7 the Hiles firm received 1,644 files, or an average of 137 new files per month instead of the 100 that was anticipated when the LMA was negotiated. In April 2013, the management of the Claims units was in transition. Jeff Hathaway ("Hathaway") replaced the retiring Aguilera as head of the SAE Unit, and Keith Daly replaced Murphy.

In August of that year, Farmers deposited $2,367,000 into Hiles' bank account with no explanation [Ex. 83, p. F700]. Steve Thompson subsequently identified the payment as being for the extra files the Hiles firm had received.

Farmers points out that after accepting the deposited check, Hiles did not point out to Farmers that this payment put Hiles at least $2 million over the year 7 profit cap. Farmers further charges that Hiles' level of persistence bordered on badgering, and that this in itself taints the attorney-client relationship such that the additional compensation could not have been fair to Farmers.

Hiles contends that the $2,367,000 payment over the year 7 cap was a payment for year 8, and therefore does not constitute an overpayment. Hathaway testified that the payment was intended to compensate Hiles for all expenses related to the last 444 files assigned in year 7, plus 20% for expenses. [TR 463]

Was this $2.367 million payment to Hiles fair and reasonable to Farmers? Again, the fact that Hiles may not have needed the payment (although he testified he needed it to buy out Chris Borgeson) is not the measure of the fairness of the payment. Hiles argues that if Farmers paid it, it was fair from Farmers' perspective. In this setting, I have to agree with Hiles. Farmers had a squadron of in-house counsel, and a number of its claims management team, including Murphy and Hathaway, were themselves attorneys. If they had not considered it fair and reasonable to compensate Hiles for the additional files, they would not have done so.

I therefore find that Hiles did not breach his fiduciary duty in accepting and retaining Farmers' payment of $2,367,000 as additional compensation for the extra 444 files, and Farmers is not entitled to recoup this sum.

### H. Did the Hiles Firm Breach the LMA and/or its Fiduciary Duties by Failing to Provide an Accounting?

On September 19, 2014, Mr. Hathaway asked Hiles for an accounting relating to: 1) the Trust Account; 2) legal fees and expenses from Retained Counsel handling the SAE cases that were billed to, but not yet paid by, Hiles; and 3) legal fees and expenses incurred by Retained Counsel but not yet billed to Hiles. [Ex. 49] Hiles did not respond to this request, testifying that Farmers was "not entitled to anything" and that he was going to "get around" to responding to the request on "my timetable." [TR 4:118 – 119] In fact, he never did provide the information requested by Mr. Hathaway. [TR 2:179] When Farmers' legal department sent a November 17, 2014 letter to Mr. Hiles again seeking an accounting, including confirmation that Hiles had paid outside counsel for the "CAT" cases for which he sought reimbursement from Farmers [Ex. 57], Hiles did not respond to this request for an accounting either, testifying that he found the letter "arrogant" and "insulting." [TR 4:121 – 122]

There is no doubt that Hiles failed and refused to provide Farmers with the accounting necessary for it to take over the case files from Hiles after taking them back in-house. There was no excuse for Hiles not to make the transition as smooth as possible for Farmers.

As a result of Hiles' breach of its obligations under the LMA to provide his records on demand, which under the LMA were owned exclusively by Farmers, particularly those that would have given Farmers insight into which outside counsel had been paid and which ones were still expecting payment, Hiles committed numerous breaches under the LMA, including ¶¶3.5(b), 3.9(a), 8.2(b), 9.1 and 9.2, as well of his ethical obligations under RPC 4-100 (B) (2). [Ex. 95, pp. 2-3, 9][11] As a result, Farmers had no choice but to expend attorney's fees and costs to initiate and pursue the within proceeding. Farmers is entitled to recover some or all of its attorney's fees and costs during the second portion of this proceeding.

### I. Did Hiles Breach Its/His Contractual and Fiduciary Obligations by Failing to Pay Retained Counsel?

Because he believed that Farmers owed him approximately $900,000 in CAT fees, after Farmers notified him that it was not renewing the contract, in October, 2014 Hiles withheld from what he paid outside counsel the $900,000 he believed he was owed, on the assumption that Farmers would be more likely to pay outside counsel than Hiles. [TR 4: 126, 132.] Farmers was faced with demands, and at least one lawsuit, from the outside counsel that Hiles declined to pay. [Ex. 71] The parties stipulated to the admission of an updated chart of payments reflecting Farmers' payments of $980,192.70 to outside counsel. [Ex. 79A; TR 4:2-3]

Hiles admitted that by declining to pay outside counsel on behalf of Farmers, he put his own interests before those of his client. [TR 4:134] Hiles also concedes on page 4 of his Response Brief

---

[11] To put these breaches in context, Mr. Hiles also testified that it was right around this time that his wife was diagnosed with a life-threatening medical diagnosis, and began a series of grueling treatments, and further, that he was faced with gargantuan financial demands—of his own making—which in combination undoubtedly prevented him from thinking as clearly as he otherwise could have.

that Farmers had every right to expect Hiles to continue to pay all outside counsel bills incurred through September 30, 2014. Engaging in self-help with client funds that were held in trust for a different purpose, thus putting his client at risk, is clearly a breach of fiduciary duty by Hiles. [TR 4:264 – 265; Ex. 95, pp. 8-9]

Because of Hiles' breaches, Farmers is entitled to reimbursement of the $980,192.70 that it advanced to Hiles for outside legal fees, which Farmers had to pay instead. Farmers concedes that it would be too difficult to ascertain a precise date for purposes of awarding prejudgment interest on this sum and therefore waives it with regard to this element of its damages.

### J. Did Farmers Breach the LMA by Failing to Give Hiles Four Months' Notice of Discretionary Termination?

Under the LMA, the Hiles firm was to perform coordinating counsel litigation management services on Farmers' SAE cases for an initial term of 5 years, *exclusive of the Paid TAP*, unless earlier terminated. [Ex. 4, §2.1] Section 2.2 gave FIE the option to renew the LMA for a term of two additional years. The 1st Addendum to LMA, Ex. 32, extended the term of the LMA for three years, through March 31, 2015, but makes no mention of PTAP[12].

On September 19, 2014 Hathaway advised Hiles by e-mail that pursuant to §7 of the LMA, on September 30, 2014 Farmers would assume responsibility for managing SAE files and thereafter for payment of retained counsel, and that it therefore needed Hiles' files returned by that date. Hiles was owed an ALAE payment for September, and was told to expect that payment in mid-October. Also, Hiles was told that the Hiles firm could expect two ULAE payments totaling $622,000 by the end of September. However, there would be no more ALAE payments, since FIE would be handling the SAE claims in-house after September 30. [Ex. 49]

Paragraph 6 of the LMA is entitled "Rights of Termination" and identifies the rights and remedies of the parties with regard to premature or discretionary termination of the LMA. Paragraph 6.1, under which Hiles claims Farmers proceeded, provides as follows:

> 6.1    FIE Discretionary Right to Terminate. FIE may terminate this Agreement prior to the end of the Term at any time for any reason, upon 120 days written notice to Hiles at the end of which the Paid Transition Assistance Period shall commence." [Ex. 4, ¶ 6.1]

Paragraph 7 of the LMA is entitled "Effect of Termination." Paragraph 7.1 of the LMA dealing with the Paid Transition Assistance Period ("PTAP"), governs only where neither party has exercised its discretion to prematurely terminate the LMA.

> 7.1    Paid Transition Assistance Period.
> (a) Commencing (i) six (6) months prior to the natural expiration of the Agreement; or (ii) 120 days after notice of a discretionary termination of the Agreement by FIE pursuant to

---

[12] Exhibit 22, though not denominated an amendment to the LMA, also changed the terms and conditions in May 2009 by increasing the number of cases Hiles would handle each year at no additional charge, reserving to him the right to request an adjustment in contract price should he deem it necessary. Again, no mention was made of when the PTAP period could begin.

Section 6.1, there shall be in effect a "Paid Transition Assistance Period" during which Hiles will provide to FIE or to its designee all necessary assistance to facilitate the orderly transfer of responsibility for the Services from Hiles to FIE or its designee.

    (i) The [PTAP] shall continue for as long as necessary to effect the transition of responsibility for management of SAEs from Hiles to FIE or FIE's designee, but in no event shall it exceed six (6) months.

    (ii) During the [PTAP], there will be the transfer of all Records and files by Hiles to FIE in a rapid, orderly, mutually agreeable manner and format . . .

    (iii) During the [PTAP], FIE shall continue to remit to Hiles the monthly ULAE Fee . . .

    (iv) Hiles shall remain responsible under the terms and conditions of this Agreement for the fees and costs of Retained Counsel . . . incurred before the date of commencement of the [PTAP] . . .

    (v) Upon commencement of the [PTAP], Hiles and FIE shall determine which one of them is to pay the fees and costs of Retained Counsel . . . incurred during and after the [PTAP], and the amount of ALAE Fee to be paid to Hiles by FIE during the [PTAP]. If there is no agreement, FIE shall assume responsibility for payment of said fees and costs and FIE shall not pay any ALAE Fee to Hiles during and after the [PTAP]. [Ex. 4, ¶ 7.1]

(Emphasis supplied).

If Hiles is correct, Farmers should have given Hiles four (4) months' notice prior to invoking the PTAP period, and therefore owes him a total of four (4) months of ULAE payments, rather than the two (2) that were provided, and four (4) months of ALAE payments, only one of which was provided, for a total of $11,822,000.

Although Hiles' basis for this counterclaim is not crystal clear, it appears that his argument is based on a comparison of the way Farmers is required to treat Hiles in the event they prematurely end the LMA without cause, with the way Farmers contends it is permitted to treat Hiles should they decide to invoke the PTAP period six (6) months before the natural end of the LMA. In the former event, Farmers would have to give Hiles a paid 4-month notice, while in the latter, Farmers could avoid future payments entirely because the transfer of files could be, and was, done electronically in one night.

Yet that is what the LMA says—Farmers was within its rights under ¶7.1 (a) to invoke the PTAP when it did—six (6) months' prior to the natural end of the LMA. Therefore, Hiles shall take nothing on his counterclaim for premature termination of the LMA without compensation.


## IV.    PUNITIVE DAMAGES.

Farmers seeks an award of punitive damages for each breach of fiduciary duty. The LMA provides in ¶14 (c) that "the arbitrator may not award punitive damages." Farmers argues that both sides have either waived that provision, or consented to an amendment to the LMA permitting an award of punitive damages in this proceeding, by virtue of seeking punitive damages in their pleadings and briefs, and by not objecting to the imposition of punitive damages when a discussion of the propriety of taking evidence necessary to an award of punitive damages arose during the hearing.

Hiles asserts that under the LMA, punitive damages are not arbitrable, and the arbitrator would, in effect, exceed her jurisdiction were she to award punitive damages.

Did the parties knowingly and intentionally relinquish the protection of the LMA from a punitive damages award? Or did both sides simply assume that punitive damages could be awarded, and therefore reflexively request them? Particularly absent some showing of detrimental reliance, I decline to find that Hiles knowingly waived his protection from punitive damages.

I therefore decline to award punitive damages in this case.

## V.    AWARD

A. Hiles shall pay to Farmers the sum of $2,533,291 it wrongfully took from the Trust Account on November 17, 2014, along with prejudgment interest at 10% of $374,788.26 for a total of $2,908,079.26.

B. Hiles shall pay to Farmers the sum of $280,000 on account of the Year 3 overpayment.

C. Hiles shall pay to Farmers the sum of $500,000, along with prejudgment interest of $145,890.41, for a total of $645,890.41 on account of the Year 6 overpayment.

D. The Hiles firm breached the LMA by failing to provide its accounting records to Farmers, and shall pay for Farmers' fees and costs in an amount to be determined based on post-Award briefing.

E. The Administrative fees and expenses of the AAA totaling $30,600.00 are to be borne $30,600.00 by Russel D. Hiles; Hiles Borgeson LLP. The Compensation and expenses of the Arbitrator totaling $47,745.00 are to be borne $47,745.00 by Russel D. Hiles; Hiles Borgeson LLP. Therefore, Russel D. Hiles; Hiles Borgeson LLP shall pay Farmers Insurance Exchange, the amount of $39,172.50.

F. Hiles shall repay to Farmers the $980,192.70 it advanced to Hiles for outside legal fees that Hiles did not use to pay legal fees.

The above sums are to be paid on or before 30 days from the date of this Final Award.

This Partial Final Award resolves all claims and counterclaims submitted in this arbitration, except for the amount of prevailing party attorney's fees to be awarded to Farmers, the resolution of which shall be determined in a separate Award based on post-Award submissions. With the exception of prevailing party attorney's fees to be awarded to Farmers in a separate Award, all claims not expressly granted herein are hereby denied.

DATED: May 27, 2016

*Deborah Rothman*

Arbitrator

EXHIBIT 2

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

### No. 01-14-0002-3063

---

Farmers Insurance Exchange,

              Claimant,

   and

Russel D. Hiles; Hiles Borgeson LLP,

              Respondents.

---

And related counterclaims.

---

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement contained in the Litigation Management Agreement ("LMA") entered into between the above-named parties in or around March 2007, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously rendered a Partial Final Award in this matter dated May 27, 2016, do hereby issue this FINAL AWARD as follows:

The liability and damages phases of the hearing were held on January 4 – 8, 2016 at the Los Angeles office of the American Arbitration Association. The parties stipulated that the issue of prevailing party attorney's fees would be reserved for post-Award submissions. Therefore, an Interim Award was issued, and following a telephonic management conference call between the arbitrator and the parties, the Interim Award was replaced by a Partial Final Award on May 27,

2016. The parties further stipulated during that call that the issue of prevailing party attorney's fees would be decided based on the parties' written submissions, and waived oral argument.

Farmers' request for attorney's fees was filed and served on June 8, 2016. Hiles had until June 22 to oppose the request. No opposition was filed by Russell D. Hiles. The hearing on this phase of the proceedings was therefore closed on June 22, 2016.

## APPEARANCES.

During this phase of the proceedings, claimant/counter-respondent Farmers Insurance Exchange ("**Farmers**" or "**FIE**"). was represented by Peter H. Mason and Joshua D. Lichtman of the Los Angeles office of Norton Rose Fulbright US, LLP. Respondents/counterclaimants[1] Russell D. Hiles of Hiles & Associates, LLP and Hiles Borgeson, LLP, Rancho Mirage, California ("Mr. Hiles" and "the Hiles firm;" jointly referred to herein as "Hiles" unless the context dictates otherwise) were represented by Russel D. Hiles, *in pro per* and as counsel for the Hiles firm.

## ANALYSIS.

Subparagraphs 14.2 (a) and (c) of the LMA, Ex. 4, provides for an award of attorney's fees and costs incurred by the prevailing party to enforce its rights under the LMA. Civil Code § 1717 (b)(1) provides that "the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract."  Where the results are mixed, the arbitrator must determine which side is the actual prevailing party.

In this case, Farmers was the prevailing party, having been awarded close to $5 million on its affirmative case, while Hiles recovered nothing on his counterclaims. While it is true that Hiles was able to limit his liability by successfully defending against several of Farmers' claims, I find that Farmers is nonetheless the prevailing party in this matter due to the magnitude of its comparative litigation success.

Farmers' motion was accompanied by its counsel's Declaration attaching redacted billing invoices to Farmers, showing that it sought reimbursable costs of $16,595.39 and fees in the amount of $670,817.97. Much legal work was necessitated by Hiles' steadfast refusal to provide critical information to Farmers so that it could stave off litigation from outside counsel that had been hired but not paid by Hiles. Given the nature and length of the disputes addressed in this proceeding and the complex and factually intensive issues presented, I find that the amount of Farmers' request

---

[1] The parties could not agree on the actual identities of the proper respondents in this matter. FIE named "Russel D. Hiles, an individual, and Hiles/Borgeson, as successor to Hiles & Associates, LLP" as respondents in its Demand and Amended Demand. The deRubertis and Shernoff firms, which successively represented Hiles in an earlier stage of the proceedings, answered and counterclaimed on behalf of "HILES & ASSOCIATES, LLP, a Limited Liability Partnership and HILES BORGESON, LLP, a Limited Liability Partnership."  The Litigation Management Agreement ("LMA") entered into between the parties and operative in this proceeding identified FIE's counter-party as "Hiles & Associates, a California LLP ('Hiles')." It was signed by Russel D. Hiles. When he submitted his Witness List and prehearing brief, *in pro per* and as counsel for his firm, Mr. Hiles identified his clients as "RUSSEL D. HILES, an individual, and HILES/BORGESON, as successor to Hiles & Associates, LLP," the same manner in which respondents had been named in FIE's Demand. Hiles testified that Hiles/Borgeson was a dba of Hiles & Associates, so named to reflect his partnership with Chris Borgeson for the purpose of operating under the LMA.

for attorney's fees and costs falls within the realm of reason given the high degree of professional skill required of Farmers' counsel in this proceeding.

**AWARD.**

  A. Hiles shall pay to Farmers the sum of $670,817.97 for attorney's fees and $16,595.39 for legal costs, for a total of $687,413.36.
  B. There have been no additional AAA costs or fees since the issuance of the Partial Final Award dated May 27, 2016.

The above sums are to be paid on or before 30 days from the date of this Final Award.

This Final Award resolves all claims and counterclaims submitted in this arbitration. All claims not expressly granted herein are hereby denied.

DATED: July 19, 2016

*Deborah Rothman*

Arbitrator

EXHIBIT 3



RECORDING REQUESTED BY

MELANIE NELL ROE

AND WHEN RECORDED MAIL DOCUMENT TO:

MELANIE NELL ROE
155 Metate Place
Palm Desert, CA  92260

**2016-0203200**
05/18/2016 01:24 PM Fee: $ 21.00
Page 1 of 3
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

*778*

Space Above This Line for Recorder's Use Only

A.P.N.: 771-300-015-6                    File No.: _____

# GRANT DEED

The Undersigned Grantor(s) Declare(s): DOCUMENTARY TRANSFER TAX $ _0_ ; CITY TRANSFER TAX $ _0_ ;

This is a bona fide gift and the Grantor received nothing in return R&T 11911

[      ] computed on the consideration or full value of property conveyed, OR
[      ] computed on the consideration or full value of liens and/or encumbrances remaining at time of sale,
[      ] unincorporated area; [ X ] City of Palm Desert, and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, RUSSEL D. HILES

hereby GRANTS to _____ MELANIE NELL ROE _____

the following described property in the City of _Palm Desert_ , County of _Riverside_ , State of California:

See attached Exhibit A.

Dated: MAY 5TH , 2015

RUSSEL D. HILES

Mail Tax Statements To: **SAME AS ABOVE**

-1-

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                    )
County of Los Angeles                              )

On _May 5, 2016_, before me, _Arcelia S.Z. Obermiller_,
(insert name and title of the officer)

Notary Public, personally appeared Russel D. Hiles, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Arcelia S.Z. Obller_                          (Seal)

ARCELIA S.Z. OBERMILLER
Commission # 2122061
Notary Public - California
Los Angeles County
My Comm. Expires Aug 30, 2019

M:\FirmDocs\HAR\Hiles, Russel\Grant Deed.MNR.doc

# EXHIBIT A
## LEGAL DESCRIPTION

**PARCEL 1:**

LOT 10 OF TRACT NO. 27709, IN THE CITY OF PALM DESERT, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY MAP ON FILE IN BOOK 245, PAGES 67 THROUGH 71, INCLUSIVE OF MAPS, RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

EXCEPTING THEREFROM ALL OIL, GAS AND MINERAL DEPOSITS TOGETHER WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME AS RESERVED BY THE UNITED STATES OF AMERICA IN THE PATENT RECORDED APRIL 25, 1961 AS INSTRUMENT NO. 35226; OCTOBER 18, 1960 AS INSTRUMENT NO. 89920 AND SEPTEMBER 13, 1961 AS INSTRUMENT NO. 78638 ALL OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA.

**PARCEL 2:**

ALL USE RIGHTS AND EASEMENTS SPECIFIED AS EXISTING IN OR GRANTED TO AN "OWNER" IN THAT CERTAIN DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR "BIGHORN" RECORDED OCTOBER 2, 1990 AS INSTRUMENT NO. 364698 AND MODIFIED OCTOBER 1, 1991 AS INSTRUMENT NO. 340403 AND BY DECLARATION OF ANNEXATION RECORDED AUGUST 3, 1993 AS INSTRUMENT NO. 301648, OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA (THE "DECLARATION").

**PARCEL 3:**

NON-EXCLUSIVE EASEMENTS OVER, UNDER AND ACROSS THE PALM VALLEY STORMWATER CHANNEL PROJECT FOR BRIDGES, WATER, SEWER, TELEPHONE, ACCESS, ROAD AND OTHER UTILITY PURPOSES, SUBJECT TO THE TERMS AND CONDITIONS OF THE DECLARATION AND THE TERMS AND CONDITIONS CONTAINED IN THAT CERTAIN FINAL ORDER OF CONDEMNATION ACTION, ENTERED IN CASE NO. 498807 (PREVIOUSLY CASE NO. 36116, INDIO SUPERIOR COURT) OF SUPERIOR COURT FOR THE COUNTY OF SAN DIEGO, A CERTIFIED COPY OF WHICH RECORDED FEBRUARY 23, 1990 AS INSTRUMENT NO. 67978 OF OFFICIAL RECORDS FOR RIVERSIDE COUNTY, CALIFORNIA.

APN: 771-300-015-6

# EXHIBIT "A"

EXHIBIT 4

CONFIDENTIAL

1        AMERICAN ARBITRATION ASSOCIATION

2

3    ------------------------------           **CERTIFIED**
                                    )          **TRANSCRIPT**
4    FARMERS INSURANCE EXCHANGE,    )
                                    )
5            Claimant and           )
            Counter-Defendant,      )
6                                   )  No. 01-14-0002-3063
        vs.                         )
7                                   )
                                    )
     RUSSEL D. HILES, an            )
8    individual, and HILES[         )
     BORGESON, as successor to      )
9    Hiles & Associates, LLP,       )
                                    )
10           Respondents and        )
            Counter-Claimants.      )
11   ------------------------------  )

12

13

14

15               ** CONFIDENTIAL **

16           TRANSCRIPT OF PROCEEDINGS

17            Los Angeles, California

18          Thursday, January 7, 2016

19                Volume IV

20

21   Reported by:

22   NADIA NEWHART

23   CSR No. 8714

24   Job No. 2207745

25   PAGES 736 - 1039

                                    Page 736

Ex. 4, p. 0045

CONFIDENTIAL

1          AMERICAN ARBITRATION ASSOCIATION

2

3      _____
                                      )
4      FARMERS INSURANCE EXCHANGE,    )
                                      )
5              Claimant and           )
       Counter-Defendant,             )
                                      )
6                                     )    No. 01-14-0002-3063
           vs.                        )
7                                     )
       RUSSEL D HILES, an             )
8      individual, and HILES |        )
       BORGESON, as successor to      )
9      Hiles & Associates, LLP,       )
                                      )
10             Respondents and        )
       Counter-Claimants.             )
11     _____    )

12

13

14

15          TRANSCRIPT OF PROCEEDINGS, Volume IV, taken at

16     725 South Figueroa Street, 4th Floor, Los Angeles,

17     California, beginning at 9:37 a.m. and ending at

18     6:53 p.m. on Thursday, January 7, 2016, before

19     NADIA NEWHART, Certified Shorthand Reporter No. 8714.

20

21

22

23

24

25

                                              Page 737

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1   APPEARANCES:

 2

 3   THE ARBITRATOR:

 4       DEBORAH ROTHMAN, ESQ.

 5

 6   For Claimant and Counter-Defendant:

 7       NORTON ROSE FULBRIGHT

 8       BY:  PETER H. MASON

 9       BY:   JOSHUA D. LICHTMAN

10       Attorneys at Law

11       555 South Flower Street, 41st Floor

12       Los Angeles, California 90071

13       213-892-9200

14       peter.mason@nortonrosefulbright.com

15       joshua.lichtman@nortonrosefulbright.com

16

17   For Respondents and Counter-Claimants:

18       HILES & ASSOCIATES

19       BY:  RUSSEL D. HILES

20       Attorney at Law

21       41-750 Rancho Las Palmas Drive, Suite N-3

22       Rancho Mirage, California 92270

23       310-948-2408

24       rhiles@hilesborgeson.com

25
```

Page 738

CONFIDENTIAL

```
 1    APPEARANCES (Continued):

 2

 3    Also Present:

 4        MARGARET (CASEY) GILES, ESQ., client representative

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 739
```

CONFIDENTIAL

```
 1       Q    Did you recently refinance any of your other

 2  properties?

 3       A    No.

 4       Q    Do you have any substantial debts outside of

 5  mortgage responsibilities that you've just described?    03:26:52

 6       A    Substantial?  No, I have other debt.

 7       Q    Do they total more than a million dollars?

 8       A    No.

 9       Q    What would you estimate to be your net worth

10  as of today?                                             03:27:08

11       A    Somewhere close to $100,000.

12       Q    Is that excluding the Bend property?

13            THE ARBITRATOR:  The which property?

14            MR. MASON:  The Bend, Oregon property.

15            THE WITNESS:  I have no offers on the Bend     03:27:26

16  property, and I have to liquidate it because I don't

17  have much money to live on.  I was planning on retiring

18  by finishing out my contract with Farmers, and it's

19  gone.  I have -- I have a property that I just sold in

20  Century City, and I'll get 200,000 and it will net me    03:27:55

21  maybe a hundred thousand.

22            I have other -- the Bend residence and the

23  desert residence are my wife's, and I pay the mortgage

24  on them.

25       Q    Is your wife the sole owner of the Bend        03:28:20
```

Page 919

CONFIDENTIAL

1    property now?

2         A    No, not yet.  She will be at some point.

3         Q    Do you plan to transfer sole ownership to her?

4         A    Yes.

5         Q    You haven't done that yet?                    03:28:31

6         A    No, but I have -- and I have monthly bills to

7    live on a month-to-month basis of about $45,000 a

8    month.

9         Q    Does that include mortgage responsibilities?

10        A    Yes.  And I have no more income, and I don't    03:28:51

11   have enough money to invest to generate income.

12        Q    Do you ascribe no value to the Bend property

13   at this point?

14        A    Well, there's no value until -- to me until I

15   sell it.  Right now, it's a piece of property that's    03:29:10

16   sitting there.  It's a beautiful piece of property, but

17   it's sitting there, and I have no buyer.  So it's --

18   it's simply a hole to throw money into.

19            So I don't have any -- any revenue generated

20   from anything and any source anywhere other than the 2   03:29:33

21   million that I took, and I used about 500,000 of it to

22   fix -- finish the house in Bend and to pay medical

23   bills for my wife.  And the other 1.5 million I've been

24   living on for the last 14, 15 months.  And I am down to

25   $150,000, so that's where I'm at.  I have no idea how    03:30:15

Page 920

Ex. 4, p. 0050

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 555 S. Flower Street, 41st Floor, Los Angeles, California

A true and correct copy of the foregoing document entitled (*specify*): *CREDITOR FARMERS INSURANCE EXCHANGE'S OBJECTION TO NOTICE OF SALE OF ESTATE PROPERTY [DKT. #34] AND OPPOSITION TO DEBTOR'S MOTION [DKT. #32] FOR AUTHORITY TO: (1) EMPLOY CONCIERGE AUCTIONS, LLC TO AUCTION DEBTOR'S PROPERTY (66876 Gist Rd., Bend, OR 97703) AND PAYMENT OF MARKETING FEES AND AUCTIONEER FEES (BUYERS PREMIUM); (2) EMPLOY CASCADE SOTHEBY'S INTERNATIONAL REALTY AS REAL ESTATE BROKER; (3) SELL THE PROPERTY AT AUCTION SUBJECT TO COURT APPROVAL AND ALLOWING ACCEPTANCE OF BACK-UP BIDDERS; (4)  ESTABLISH BIDDING PROCEDURES; (5) SCHEDULE HEARING DATE FOR APPROVAL OF AUCTION; (6) PAY   SECURED   CREDITOR,   PROPERTY   TAXES,   AND CLOSING COSTS; AND; (7) APPROVE OF SALE FREE AND CLEAR OF LIENS PURSUANT TO 11 U.S.C. SECTION 363(f) [DKT. #32]* will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) *August 30, 2016*, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Robert P. Goe -  kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- William F. McDonald -  Caecf@tblaw.com, wfm@tblaw.com;snchampney@tblaw.com
- Jason K. Schrader -  jason.K.Schrader@usdoj.gov
- United States Trustee (RS) -  ustpregion16.rs.ecf@usdoj.gov
- Jennifer C. Wong -  bknotice@mccarthyholthus.com

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) *August 30, 2016*, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

### See attached Proof of Service List

☒ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) *August 30, 2016*, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                  **F 9013-3.1.PROOF.SERVICE**

as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hon. Wayne Johnson
United States Bankruptcy Court
Riverside Division
3420 Twelfth Street
Ctrm. 304
Riverside, California  92501

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 8/30/16 | Rebecca J. Winthrop | /s/ Rebecca J. _Winthrop_ |
|---------|---------------------|---------------------------|
| _Date_  | _Printed Name_      | _Signature_               |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                                                    **F 9013-3.1.PROOF.SERVICE**

## PROOF OF SERVICE LIST

### VIA CERTIFIED

Brian T. Moynihan
Chairman & CEO
Bank of America
100 N. Tryon Street
Charlotte, NC  28255

Bank of America
Resident Agent
CT Corp. System
818 W. 7th Street, #930
Los Angeles, California 90017

### VIA U.S. MAIL

Russel D. Hiles
155 Metate Place
Palm Desert, California  92260

Lavar Taylor
3 Hutton Center Drive Suite 500
Santa Ana, CA 92707

Allied Public Storage
11259 W. Olympic Blvd
Los Angeles, CA 99064

Amex
Correspondence
P.O. Box 981540
El Paso, TX 79998

Bank Of America
Nc4-105-03-14
P.O. Box 26012
Greensboro, NC 27410

Bank Of The West
2527 Camino Ramon
San Ramon, CA 94583

Bank of the West
2527 Camino Ramon
P.O. Box 5172
San Ramon, CA 94583-5172

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

Barclays Bank Delaware
P.O. Box 8801
Wilmington, DE 19899

Bighorn Clubhouse Project
MSC 614
P.O. Box 52163
Phoenix, AZ 85072

Bighorn Golf Club-Clubhouse Project
255 Palowet Dr.
Palm Desert, CA 92260

Bighorn Homeowners Assn.
MSC 855
P.O. Box 29049
Phoenix, AZ 85038

Bighorn Homeowners Assn.
255 Palowet
Palm Desert, CA 92260

Central Electric Cooperative, Inc.
P.O. Box 846
Redmond, OR 97756

Chase Card Services
Attn:  Correspondence Dept.
P.O. Box 15298
Wilmington, DE 19850

Christopher T. Borgeson
2150 Ladera Rd.
Ojai, CA 93023

Cindy Ellen Hiles
13327 Atwater Lane
Lake Oswego, OR 97034

Citicorp Credit Services
Centralized Bankruptcy
P.O. Box 790040
St. Louis, MO 63129

County of Los Angeles Treasurer & Tax Collector
P.O. Box 514818
Los Angeles, CA 90051-4918

County of San Diego Treasurer & Tax Collector
1600 Pacific Hwy., Rm. 162
San Diego, CA 92101-2474

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                        **F 9013-3.1.PROOF.SERVICE**

Cranfill, Sumner & Hartzog
P.O. Box 27808
Raleigh, NC 27611-7808

De Castro, West, et al.
Attn:   Michael Cohen
10960 Wilshire Blvd., 14th Fl.
Los Angeles, CA 90024-3881

De Castro West, et al.
10960 Wilshire Blvd., 14th Fl.
Los Angeles, CA 90024-3881

Deschutes County Assessor
P.O. Box 6005
Bend, OR 97708

Deschutes County Treasurer
1300 NW Wall St., #204
Bend, OR 97701

Eisenhower Medical Center
39000 Bob Hope Drive
Rancho Mirage, CA 92270

Ford Motor Credit
Po Box 62180
Colorado Springs, CO 80962

Franchise Tax Board
Attn: Bankruptcy
P.O. Box 2952
Sacramento, CA 95812-2952

Franchise Tax Board
P.O. Box 942867
Sacramento, CA 94267

Franchise Tax Board
Vehicle Registration Collections
P.O. Box 419001
Rancho Cordova, CA 95741-9091

Internal Revenue Service
P.O. Box 145566
Cincinnati, OH 45250-5566

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
1973 N. Rulon White Blvd.
Ogden, UT 84201-0021

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

Internal Revenue Service
225 W. Broadway, Ste. 200
Glendale, CA 91204-1345

Katz Cassidy
11400 W. Olympic Blvd., #1050
Los Angeles, CA 90064

KeyBank
P.O. Box 94722
Cleveland, OH 44101-4722

KeyBank NA
Attn:   Recovery Payment Processing
4910 Tiedeman Road
Rtg Code: 08-01
Brooklyn, OH 44144

Law Offices of Ryneal & Ryneal
3890 11th Street, Ste. 116
Riverside, CA 92501

Law Offices of Wm. A. Brown, Jr.
865 Figueroa St., #2640
Los Angeles, CA 90017-5472
Loma Linda Medical Center
11234 Anderson St.
Loma Linda, CA 92354

Los Angeles Collection Service Inc.
2140 Westwood Blvd. , Ste. 222
Los Angeles, CA 90025

MasterCard
837 3rd St.
Santa Monica, CA 90403

MB Financial Services
36455 Corporate Dr.
Farmington Hills, MI 48331

Mercedes Benz Financial Services
P.O. Box 685
Roanoke, TX 76262

Mercedes Benz Financial Services
P.O. Box 17466
Baltimore, MD 21297-1496

Michael & Associates, PC
555 St. Charles Dr., Ste. 204
Thousand Oaks, CA 91360

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                          **F 9013-3.1.PROOF.SERVICE**

Paychex
c/o CT Corporation System
818 West Seventh St. Ste. 930
Los Angeles, CA 90017

Porsche Financial Services
980 Hammond Dr.
Atlanta, GA 30328

Public Storage
11259 W. Olympic Blvd.
Los Angeles, CA 90064

Public Storage
72150 Fred Waring Drive
Palm Desert, CA 92260

Riverside County Assessor
Attn:  Clerk
P.O. Box 751
Riverside, CA 92502-0751

Riverside County Tax Collector
Box 12005
Riverside, CA 92502-2205


San Diego County Treasurer-Tax
1600 Pacific Highway
Rm. 162
San Diego, CA 92101

State Board of Equalization
Account Information Group, MIC: 29
P.O. Box 942879
Sacramento, CA 94279-0001

State Board of Equalization
P.O. Box 942879
Sacramento, CA 94279

Suntrust Mortgage/cc 5
Attn: Bankruptcy Dept.
1001 Semmes Avenue
Va-Wmrk-7952
Richmond, VA 23224

VCA Rancho Mirage Animal Hospital
71-075 Hwy. 111
Rancho Mirage, CA 92270-4122

Veritext Century Reporters
707 Wilshire Blvd.
Suite 3500

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Los Angeles, CA 90017

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 555 S. Flower Street, 41st Floor, Los Angeles, California

A true and correct copy of the foregoing document entitled (*specify*): *CREDITOR FARMERS INSURANCE EXCHANGE'S OBJECTION TO NOTICE OF SALE OF ESTATE PROPERTY [DKT. #34] AND OPPOSITION TO DEBTOR'S MOTION [DKT. #32] FOR AUTHORITY TO: (1) EMPLOY CONCIERGE AUCTIONS, LLC TO AUCTION DEBTOR'S PROPERTY (66876 Gist Rd., Bend, OR 97703) AND PAYMENT OF MARKETING FEES AND AUCTIONEER FEES (BUYERS PREMIUM); (2) EMPLOY CASCADE SOTHEBY'S INTERNATIONAL REALTY AS REAL ESTATE BROKER; (3) SELL THE PROPERTY AT AUCTION SUBJECT TO COURT APPROVAL AND ALLOWING ACCEPTANCE OF BACK-UP BIDDERS; (4) ESTABLISH BIDDING PROCEDURES; (5) SCHEDULE HEARING DATE FOR APPROVAL OF AUCTION; (6) PAY SECURED CREDITOR, PROPERTY TAXES, AND CLOSING COSTS; AND; (7) APPROVE OF SALE FREE AND CLEAR OF LIENS PURSUANT TO 11 U.S.C. SECTION 363(f) [DKT. #32]* will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) *August 30, 2016*, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Robert P. Goe -  kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- William F. McDonald -  Caecf@tblaw.com, wfm@tblaw,com;snchampney@tblaw.com
- Jason K. Schrader -  jason.K.Schrader@usdoj.gov
- United States Trustee (RS) -  ustpregion16.rs.ecf@usdoj.gov
- Jennifer C. Wong -  bknotice@mccarthyholthus.com

☐  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) *August 30, 2016*, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

### See attached Proof of Service List

☒  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) *August 30, 2016*, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hon. Wayne Johnson
United States Bankruptcy Court
Riverside Division
3420 Twelfth Street
Ctrm. 304
Riverside, California  92501

Brian T. Moynihan
Chairman & CEO
Bank of America
100 N. Tryon Street
Charlotte, NC  28255

Bank of America
Resident Agent
CT Corp. System
818 W. 7th Street, #930
Los Angeles, California 90017

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 8/30/16 | Rebecca J. Winthrop | /s/ Rebecca J. Winthrop |
|---------|---------------------|-------------------------|
| Date    | Printed Name        | Signature               |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## PROOF OF SERVICE LIST

### VIA U.S. MAIL

Russel D. Hiles
155 Metate Place
Palm Desert, California  92260

Lavar Taylor
3 Hutton Center Drive Suite 500
Santa Ana, CA 92707

Allied Public Storage
11259 W. Olympic Blvd
Los Angeles, CA 99064

Amex
Correspondence
P.O. Box 981540
El Paso, TX 79998

Bank Of America
Nc4-105-03-14
P.O. Box 26012
Greensboro, NC 27410

Bank Of The West
2527 Camino Ramon
San Ramon, CA 94583

Bank of the West
2527 Camino Ramon
P.O. Box 5172
San Ramon, CA 94583-5172

Barclays Bank Delaware
P.O. Box 8801
Wilmington, DE 19899

Bighorn Clubhouse Project
MSC 614
P.O. Box 52163
Phoenix, AZ 85072

Bighorn Golf Club-Clubhouse Project
255 Palowet Dr.
Palm Desert, CA 92260

Bighorn Homeowners Assn.
MSC 855
P.O. Box 29049

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**

Phoenix, AZ 85038

Bighorn Homeowners Assn.
255 Palowet
Palm Desert, CA 92260


Central Electric Cooperative, Inc.
P.O. Box 846
Redmond, OR 97756

Chase Card Services
Attn: Correspondence Dept.
P.O. Box 15298
Wilmington, DE 19850

Christopher T. Borgeson
2150 Ladera Rd.
Ojai, CA 93023

Cindy Ellen Hiles
13327 Atwater Lane
Lake Oswego, OR 97034

Citicorp Credit Services
Centralized Bankruptcy
P.O. Box 790040
St. Louis, MO 63129

County of Los Angeles Treasurer & Tax Collector
P.O. Box 514818
Los Angeles, CA 90051-4918

County of San Diego Treasurer & Tax Collector
1600 Pacific Hwy., Rm. 162
San Diego, CA 92101-2474

Cranfill, Sumner & Hartzog
P.O. Box 27808
Raleigh, NC 27611-7808

De Castro, West, et al.
Attn: Michael Cohen
10960 Wilshire Blvd., 14th Fl.
Los Angeles, CA 90024-3881

De Castro West, et al.
10960 Wilshire Blvd., 14th Fl.
Los Angeles, CA 90024-3881

Deschutes County Assessor
P.O. Box 6005
Bend, OR 97708

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Deschutes County Treasurer
1300 NW Wall St., #204
Bend, OR 97701

Eisenhower Medical Center
39000 Bob Hope Drive
Rancho Mirage, CA 92270

Ford Motor Credit
Po Box 62180
Colorado Springs, CO 80962

Franchise Tax Board
Attn: Bankruptcy
P.O. Box 2952
Sacramento, CA 95812-2952

Franchise Tax Board
P.O. Box 942867
Sacramento, CA 94267

Franchise Tax Board
Vehicle Registration Collections
P.O. Box 419001
Rancho Cordova, CA 95741-9091

Internal Revenue Service
P.O. Box 145566
Cincinnati, OH 45250-5566

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Internal Revenue Service
1973 N. Rulon White Blvd.
Ogden, UT 84201-0021

Internal Revenue Service
225 W. Broadway, Ste. 200
Glendale, CA 91204-1345

Katz Cassidy
11400 W. Olympic Blvd., #1050
Los Angeles, CA 90064

KeyBank
P.O. Box 94722
Cleveland, OH 44101-4722

KeyBank NA
Attn:   Recovery Payment Processing
4910 Tiedeman Road

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

Rtg Code: 08-01
Brooklyn, OH 44144

Law Offices of Ryneal & Ryneal
3890 11th Street, Ste. 116
Riverside, CA 92501

Law Offices of Wm. A. Brown, Jr.
865 Figueroa St., #2640
Los Angeles, CA 90017-5472
Loma Linda Medical Center
11234 Anderson St.
Loma Linda, CA 92354

Los Angeles Collection Service Inc.
2140 Westwood Blvd. , Ste. 222
Los Angeles, CA 90025

MasterCard
837 3rd St.
Santa Monica, CA 90403

MB Financial Services
36455 Corporate Dr.
Farmington Hills, MI 48331

Mercedes Benz Financial Services
P.O. Box 685
Roanoke, TX 76262

Mercedes Benz Financial Services
P.O. Box 17466
Baltimore, MD 21297-1496

Michael & Associates, PC
555 St. Charles Dr., Ste. 204
Thousand Oaks, CA 91360

Paychex
c/o CT Corporation System
818 West Seventh St. Ste. 930
Los Angeles, CA 90017

Porsche Financial Services
980 Hammond Dr.
Atlanta, GA 30328

Public Storage
11259 W. Olympic Blvd.
Los Angeles, CA 90064

Public Storage
72150 Fred Waring Drive
Palm Desert, CA 92260

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                          **F 9013-3.1.PROOF.SERVICE**

Riverside County Assessor
Attn: Clerk
P.O. Box 751
Riverside, CA 92502-0751

Riverside County Tax Collector
Box 12005
Riverside, CA 92502-2205


San Diego County Treasurer-Tax
1600 Pacific Highway
Rm. 162
San Diego, CA 92101

State Board of Equalization
Account Information Group, MIC: 29
P.O. Box 942879
Sacramento, CA 94279-0001

State Board of Equalization
P.O. Box 942879
Sacramento, CA 94279

Suntrust Mortgage/cc 5
Attn: Bankruptcy Dept.
1001 Semmes Avenue
Va-Wmrk-7952
Richmond, VA 23224

VCA Rancho Mirage Animal Hospital
71-075 Hwy. 111
Rancho Mirage, CA 92270-4122

Veritext Century Reporters
707 Wilshire Blvd.
Suite 3500
Los Angeles, CA 90017

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                    F 9013-3.1.PROOF.SERVICE